OPINION OF THE COURT
Lucy Billings, J.
Respondent Comptroller of the City of New York and two respondent labor unions have moved to dismiss these two proceedings that challenge the prevailing wage schedules the Comptroller set for roadbuilders and pavers employed in public works projects in the City during fiscal years 2011 and 2012. Since the second, more recent petition incorporates the petition and supporting affidavits and exhibits in the first proceeding, the court cites principally to the record in the second proceeding.
I. The Prevailing Wage Laws
New York Constitution, article I, § 17 requires contractors engaged in public projects to pay their workers, at minimum, “the rate of wages prevailing in the same trade or occupation in the locality within the state where such public work is to be situated, erected or used.” Labor Law § 220, which implements this constitutional mandate, similarly requires public works contractors to pay their workers (1) “not less than the prevailing rate ... in the same trade or occupation in the locality *446 within the state where such public work . . . is to be situated, erected or used” (Labor Law § 220 [3] [a]), and (2) “supplements ... in accordance with the prevailing practices in the locality.” (Labor Law § 220 [3] [b]; Matter of Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d 597, 599-600 [2005]; see Matter of Lantry v State of New York, 6 NY3d 49, 54 [2005].) Labor Law § 220 (5) (e) designates respondent Comptroller the fiscal officer responsible for determining the prevailing wages for trades and occupations in the City, who bears the duty “to make a proper classification” of work into a trade or occupation. (Labor Law § 220 [3-a] [a] [i]; Matter of General Elec. Co. v New York State Dept. of Labor, 154 AD2d 117, 120 [3d Dept 1990], affd 76 NY2d 946 [1990]; see Labor Law § 220 [3], [5] [e]; Lantry v State of New York, 6 NY3d at 54 n 5; Ramos v SimplexGrinnell LP, 796 F Supp 2d 346, 364 [ED NY 2011].)
Consequently, before setting the prevailing wages for a trade or an occupation, the Comptroller classifies work into a specified trade or occupation. The Comptroller’s classifications for fiscal year 2011, which the Comptroller continued in fiscal year 2012, lie at the heart of the controversy in these proceedings. Having classified work into a trade or occupation, the Comptroller then sets the prevailing wages for that work using the wages set by collective bargaining agreements (CBAs) between labor unions and employers employing at least 30% “of workers, laborers or mechanics in the same trade or occupation” in the City. (Labor Law § 220 [5] [a]; see Lantry v State of New York, 6 NY3d at 54-55; Matter of General Elec. Co. v New York State Dept. of Labor, 154 AD2d at 119; Matter of Metropolitan Movers Assn., Inc. v Liu, 95 AD3d 596, 599 [1st Dept 2012]; Matter of New York Tel. Co. v New York State Dept. of Labor, 272 AD2d 741, 744 [3d Dept 2000].)
II. Dismissal Based on Petitioners’ Lack of Standing
Respondents move to dismiss both proceedings on the grounds that petitioners lack standing to maintain their challenge to the Comptroller’s classification of work and his prevailing wages based on that classification. (CPLR 3211 [a] [7]; 7804 [f]; see CPLR 3211 [a] [3].) Petitioners are a labor union, Local 175, United Plant and Production Workers, and an association of employers employing that union’s members, whose CBA the Comptroller no longer used to set prevailing wages in fiscal years 2011 and 2012. If the employers’ association, its member employers, the union, and its member employees all lack stand *447 ing here, the Comptroller’s classification of work and his prevailing wages based on that classification are insulated from judicial review. (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 812 [2003]; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406, 413 [1987].)
A. Labor Law § 220 (6)
First, respondents rely on Labor Law § 220 (6), which provides that employers “may contest a determination by the fiscal officer” setting prevailing wages based on a CBA between a union and an employer. Although this provision applies only to employers, it does not limit the right to contest a determination to an employer whose CBA the Comptroller is using as the basis for prevailing wages, as opposed to employers, like petitioner New York Independent Contractors Alliance’s members, whose CBA the Comptroller is not using. The only mandatory limitation is on how an employer may contest the determination successfully. “The employer must allege and prove by competent evidence, that the actual percentage of workers, laborers or mechanics” covered by the CBA being used “is below the required thirty per centum” (Labor Law § 220 [6]), “in the same trade or occupation” in the City. (Labor Law § 220 [5] [a]; see New York Tel. Co. v New York State Dept. of Labor, 272 AD2d at 744; Matter of Liquid Asphalt Distribs. Assn. v Roberts, 116 AD2d 295, 298 [3d Dept 1986].)
Here, petitioner New York Independent Contractors Alliance (NYICA) contests respondent Comptroller’s determination of the prevailing wages for a trade, which the Comptroller based on the CBA between respondent unions and the employer members of respondent General Contractors Association of New York (GCA), an association of employers employing respondent unions’ members. NYICA claims that these respondents’ CBA does not cover 30% of the workers, laborers, and mechanics in the asphalt paving trade. NYICA further claims that the asphalt paving work of NYICA’s members and the union with whom NYICA has bargained was misclassified into another trade or occupation, but that, if the work were not misclassified, their CBA and not the CBA between GCA and respondent unions would cover at least 30% of the actual trade: asphalt paving.
Labor Law § 220 (6) does not prohibit that claim. That claim either is integral to contesting the determination of the prevailing wages for a trade or occupation pursuant to Labor Law § 220 (6) or is outside the scope of that statute, which nowhere *448 prohibits an employer from contesting the fiscal officer’s classification of work as factually unfounded, irrational, arbitrary, or biased as petitioners maintain here. (CPLR 7803 [3]; Matter of Action Elec. Contrs. Co. v Goldin, 64 NY2d 213, 223 [1984]; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598-599; Matter of Soho Alliance v New York State Liq. Auth., 32 AD3d 363 [1st Dept 2006]; see Goodwin v Perales, 88 NY2d 383, 392 [1996].) In sum, Labor Law § 220 (6) does not exclude other means or grounds for contesting the Comptroller’s determinations.
Finally, assuming petitioner NYICA is limited to proceeding according to Labor Law § 220 (6), respondents insist that the statute is limited to employers and therefore excludes an employers’ association like NYICA. Respondents rely on a sole question posed by the General Building Contractors to New York State Senator Joseph Pisani leading up to section 220’s amendments in 1983: “You give employers the right to challenge. How about employer organizations also?” (Aff of Jane E. Andersen, Dec. 1, 2011, exhibit A at 16.) This one inquiry from a body outside the legislature is hardly an equivocal declaration of the legislature’s intent to exclude organizations of employers from the ambit of a statute that unambiguously and undisputedly covers employers. More importantly, this one inquiry is not enough to abrogate the well established jurisprudential principles of standing that, if standing is conferred on individual persons or entities, then standing extends to organizations composed of those individual persons or entities where, as here, they meet the following criteria. (See Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 812; Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 773-774 [1991].)
First, as is undisputed by respondents, at least one of NYICA’s members, if not all, since all are individual employers that Labor Law § 220 (6) covers, establishes standing. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211 [2004]; Society of Plastics Indus. v County of Suffolk, 77 NY2d at 775; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d 412, 413 [1st Dept 2010]; Matter of Citizens Emergency Comm. to Preserve Preserv. v Tierney, 70 AD3d 576 [1st Dept 2010].) Second, the activity and interest of NYICA’s membership of contracting businesses are representative of the petitions’ claims that its members’ work was misclassified into *449 a trade or an occupation and that, if their work were not misclassified, their CBA and not the CBA between GCA and respondent unions would set the prevailing wages for public projects involving that work. In fact the claims here are entirely germane to the organization’s core purpose: to maximize NYICA members’ business and, toward that end, their opportunities to bid successfully for public projects and not be underbid by and lose work on public projects to other employers who pay lower wages. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; Rudder v Pataki, 93 NY2d 273, 278 [1999]; Matter of Aeneas McDonald Police Benevolent Assn. v City of Geneva, 92 NY2d 326, 331 [1998]; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d at 413.)
This purpose is precisely one of the interests Labor Law § 220 is intended to protect. The statute “seeks to equalize competing contractors’ labor costs.” (Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d at 601; see Brian Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist., 76 NY2d 207, 212 n 2 [1990]; Action Elec. Contrs. Co. v Goldin, 64 NY2d at 222.) The organizational petitioner thus shows that it represents and will promote the interests and objectives that the petitions seek to effect and, reciprocally, maintains a stake in the petitions’ adjudication. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; Rudder v Pataki, 93 NY2d at 278; Matter of Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d 579, 587 [1998]; Society of Plastics Indus. v County of Suffolk, 77 NY2d at 772, 775.)
Finally, nothing indicates that the relief requested requires further participation by NYICA’s individual members. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; Aeneas McDonald Police Benevolent Assn. v City of Geneva, 92 NY2d at 331; Society of Plastics Indus. v County of Suffolk, 77 NY2d at 775; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d at 413.) The merits of petitioners’ claims may be determined without exploring the individual circumstances of petitioners’ members. (E.g. Westchester County Dept. of Pub. Safety Police Benevolent Assn., Inc. v Westchester County, 35 AD3d 592, 594 [2d Dept 2006].)
B. New York Constitution, Article I, § 17
Labor Law § 220 (6) does not authorize petitioner union or its members to challenge prevailing wage determinations and hence does not confer standing on these workers or their organization to maintain their challenge here. (E.g. Matter of *450 International Assn. of Bridge, Structural & Ornamental Iron Workers, Local Union No. 6, AFL-CIO v State of New York, 280 AD2d 713, 715-716 [3d Dept 2001].) Nevertheless, their interests in reclassifying their asphalt paving work into a trade, and extending their CBA’s coverage over at least 30% of the trade, so that their CBA is used to set the prevailing wages for public projects, is fully consistent with the interests protected by New York Constitution, article I, § 17. It requires contractors engaged in public projects to pay their workers the prevailing wages in the same trade or occupation. Petitioner union and its membership claim that contractors on public projects currently do not pay their asphalt pavers the prevailing wages in that trade, but, if asphalt pavers were reclassified into a trade, they would be paid the prevailing wages for that trade.
Petitioner union and its members, by alleging that respondent Comptroller has misclassified asphalt pavers into another trade or occupation, so they are paid less than the actual prevailing wages for asphalt paving, show the harmful effect of the Comptroller’s determination on them. (Matter of Local 363, Intl. Bhd. of Elec. Workers v New York State Dept. of Labor, 230 AD2d 440, 443-444 [3d Dept 1997]; see New York Tel. Co. v New York State Dept. of Labor, 272 AD2d at 743.) Being paid less than the actual prevailing wages for the work is the principal injury the prevailing wage laws are intended to remedy. (E.g. Brian Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist., 76 NY2d at 212 n 2; Matter of Beltrone Constr. Co. v McGowan, 260 AD2d 870, 871-872 [3d Dept 1999].) The Comptroller’s “mission is to ensure that workers are paid the correct wage.” (Lantry v State of New York, 6 NY3d at 56; see Matter of A. Uliano & Son. Ltd. v New York State Dept, of Labor, 97 AD3d 664, 666 [2d Dept 2012]; Beltrone Constr. Co. v McGowan, 260 AD2d at 873.) Nothing in article I, § 17 manifests a legislative intent negating workers’ rights to contest a prevailing wage determination and to effect a remedy that secures the prevailing wage owed to them (Bucci v Village of Port Chester, 22 NY2d 195, 201 [1968]; General Elec. Co. v New York State Dept. of Labor, 154 AD2d at 119; P & T Iron Works v Talisman Contr. Co., Inc., 18 AD3d 527, 528 [2d Dept 2005]; E. Williamson Roofing & Sheet Metal Co. v Town of Parish, 139 AD2d 97, 103-104 [4th Dept 1988]), as “necessary to the accomplishment of the Legislature’s mandate to ensure that workers receive that prevailing wage.” (General Elec. Co. v New York State Dept. of Labor, 154 AD2d at 121; see New York State Assn. of Nurse Anesthetists v Novello, 2 *451 NY3d at 211; Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d at 587; Society of Plastics Indus. v County of Suffolk, 77 NY2d at 773-774.)
Just as employers maintain standing under Labor Law § 220 (6) if a prevailing wage determination injures them, likewise, if a prevailing wage determination injures employees, they maintain standing under New York Constitution, article I, § 17 to pursue these proceedings. Just as petitioner NYICA establishes standing if NYICA’s employer members establish standing, so, too, if the employee members of petitioner union establish standing, petitioner union establishes standing, as the union membership’s interest in securing the highest wages and the most work for members is fully consistent with the relief sought by the petitions. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211; Rudder v Pataki, 93 NY2d at 278; Aeneas McDonald Police Benevolent Assn. v City of Geneva, 92 NY2d at 331; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d at 413.)
C. Injury to Petitioners’ Members
Respondents claim that, even if the Labor Law provides a legal basis for NYICA’s standing, NYICA’s members fail to allege any injury from the Comptroller’s determination of prevailing wages. Certainly one type of injury against which the prevailing wage laws are intended to protect is workers “being induced, or obliged, to accept wages below the prevailing rate from a public employer.” (Bucci v Village of Port Chester, 22 NY2d at 201; see Brian Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist. 76 NY2d at 212 n 2; A. Uliano & Son. Ltd. v New York State Dept. of Labor, 97 AD3d at 666; Beltrone Constr. Co. v McGowan, 260 AD2d at 871-872; Ramos v SimplexGrinnell LP, 796 F Supp 2d at 366.) Although NYICA’s members are employers, not workers, its claims, if successful, would protect asphalt pavers, whom its members employ, against lower wages for work on public projects. Currently, asphalt pavers on public projects must accept wages below the wages in asphalt pavers’ CBA with NYICA members. If their CBA were the measure for the prevailing wages, the prevailing wages for asphalt pavers would be higher. Petitioners’ claims seek this remedy: if asphalt pavers were not misclassified into a trade or an occupation of pavers and roadbuilders as currently, the higher wages in petitioners’ CBA would be the measure for the prevailing wages. Securing these protections also promotes Labor Law § 220 (3)’s primary purpose “to strengthen the position of union laborers *452 and workers in the competitive bidding process” applicable to all sizable public projects. (E. Williamson Roofing & Sheet Metal Co., Inc. v Town of Parish, 139 AD2d at 104; see General Municipal Law § 103.)
Since NYICA members are not the workers themselves, however, these employers obviously do not allege an injury because their workers are paid below the prevailing wages. Instead, they allege an injury because, under their CBA with asphalt pavers, the employers pay these workers above the prevailing wages, so NYICA members are underbid for public projects by other employers who pay only the lower prevailing wages. Again, these interests are the interests Labor Law § 220 is intended to protect. {Id.) The statute seeks both “to equalize competing contractors’ labor costs,” and, through this equalization, “ensure[ ] that the winning bid on a public project is not made on the backs of the contractor’s employees.” (Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d at 601.)
In sum, NYICA members are injured not because they must pay prevailing wages that are set too high, but because the prevailing wages are set too low, causing these employers to lose work on public projects to other employers that will pay those lower wages when NYICA members do not. (Brian Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist., 76 NY2d at 212 n 2; Action Elec. Contrs. Co. v Goldin, 64 NY2d at 222; Maraia v Orange Regional Med. Ctr., 63 AD3d 1113, 1115-1116 [2d Dept 2009]; E. Williamson Roofing & Sheet Metal Co., Inc. v Town of Parish, 139 AD2d at 104; see New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211, 214; Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d at 587; Society of Plastics Indus. v County of Suffolk, 77 NY2d at 779-780.) Importantly, petitioners seek not to protect against competition or to reduce competition, but instead to increase competition. (See Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d at 412; Matter of New York State Psychiatric Assn., Inc. v Mills, 29 AD3d 1058, 1060 [3d Dept 2006].)
Consequently, the asphalt pavers in petitioner union, who work under their CBA with NYICA members, likewise do not obtain work on public projects. Petitioner union members are injured not because the wages these workers receive under their CBA are too low, but because, to obtain work on a public project, they must accept prevailing wages that are set too low, lower than the rates their employers pay. These workers also *453 lose work on public projects to other workers who will accept those lower wages because they are comparable to the rates those other workers’ employers pay.
Although a remedy for petitioner union members might be to lower the wages in their CBA, the workers need not be relegated to such a solution after they successfully negotiated higher wages, if the Comptroller unlawfully classified their trade and determined the prevailing wages based on that unlawful classification. Moreover, petitioners allege that their union members include workers who, under the Comptroller’s schedule, will be excluded altogether from the required prevailing wages if these workers accept work on a public project, because
“the Comptroller’s new classification unjustifiably narrows the protection of the prevailing wage law by limiting the class of protected workers solely to workers who perform production paving. ... By the creation of this new classification, . . . many individuals who previously were entitled to be paid prevailing wages will no longer be able to receive such wage rates.” (Verified petition, Aug. 9, 2010, exhibit 7, ¶ 20.)
Respondent unions contend that NYICA fails to allege either that NYICA’s members have been underbid for public projects by other employers who pay only the lower prevailing wages the Comptroller has set or that members have lost work on public projects to other employers that will pay those lower wages. In determining motions to dismiss based on lack of standing, the court accepts the allegations of the verified petitions and petitioners’ affidavits as true. (Rhodes v Herz, 84 AD3d 1, 3 n 1 [1st Dept 2011]; Trustees of the Plumbers Local Union No. 1 Additional Sec. Benefit Fund v City of New York, 73 AD3d 530, 531 [1st Dept 2010]; Hammer v American Kennel Club, 304 AD2d 74, 78 [1st Dept 2003]; Shui Kam Chan v Louis, 303 AD2d 151, 152 [1st Dept 2003].) To establish standing, petitioners need not specifically quantify their injury, but they must show that it is not merely speculative and is more than conjectural. (E.g. New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 211, 213; Rudder v Pataki, 93 NY2d at 279; Matter of New York Propane Gas Assn. v New York State Dept. of State, 17 AD3d 915, 916 [3d Dept 2005].)
The petition in the second proceeding, for example, verified by NYICA’s director, first describes the Comptroller’s undisputed action that petitioners challenge: setting “prevailing wage *454 and benefit rates for asphalt paving workers not engaged in production paving” that reflect the rates in respondents’ CBA “for workers performing concrete paving.” (Verified petition ¶ 20, Oct. 17, 2011.) This petition then refers to the “differential” between those lower rates and “what NYICA Contractor Employers must pay asphalt paving workers” under their CBA with petitioner union {id.), and describes the economic injury this differential has caused. “This differential has made it substantially more difficult for NYICA Contractor Employers to compete with GCA Contractor Employers for public work because the labor component of their [NYICA Contractor Employers’] bid will generally be much higher.” {Id. ¶ 21.)
This more recent petition relies on 10 affidavits, attached as exhibits to the petition, from NYICA’s director of contractor coordination James Kilkenny and nine NYICA members that employ petitioner union Local 175 members who are asphalt pavers. The petition and supporting affidavits refer to respondent unions, Highway and Street Laborers Local Union 1010 and Sheet Asphalt Workers Local Union 1018, as Local 1010 and Local 1018. Kilkenny attests that
“the newly created job classification of ‘Paver & Roadbuilder-Laborer,’ which for the first time puts workers performing asphalt paving into a classification with workers who perform concrete paving, has placed each NYICA contractor under contract with Local 175 at a substantial competitive disadvantage. Prior to the creation of the new classifications, Local 175 contractors (represented by NYICA) competed with Local 1018 contractors (represented by GCA) for public work jobs and paid essentially the same rates under the collective bargaining agreements in effect for Local 175 and Local 1018.
“Under the new classifications, a Local 1010 contractor such as Tully Construction or William Gross only have to pay Local 1010 wage rates to workers performing asphalt paving who are not engaged in production paving. Because these rates are lower than the rates NYICA contractors must pay Local 175 members, in some cases as much as $5.06 per hour lower, the ability of NYICA contractors to compete with Tully Construction and William Gross and the other Local 1010 contractors has been significantly diminished. This loss of competitiveness directly translates into less public work for *455 NYICA contractors and less work for Local 175 members whom they employ on public jobs.” (Verified petition, Oct. 17, 2011, exhibit 2, aff of James Kilkenny ¶¶ 14-15 [emphasis added].)
The owner of NYICA member NICO Asphalt Paving in Brooklyn, New York, attests similarly from the experience of his business:
“NICO and its employees who are Local 175 members have been directly harmed by the Comptroller’s prevailing wage schedule which has created new classifications for production paving and has reclassified asphalt paving workers who are not engaged in production paving as ‘Laborers’ under the work classification appearing in Local 1010’s CBA. This reclassification has substantially decreased the prevailing wage for asphalt paving workers not engaged in production paving and has resulted in a substantial differential between the hourly rate NYICA employers who are signatories of the Local 175 Paving Division CBA must pay these workers and what employers who are members of the General Contractors Association must pay under its CBA with Local 1010.
“Because of the higher labor costs that NICO must pay to Local 175 members and the highly competitive bidding environment in New York City for public work, NICO has lost its ability to compete for public work in New York City.” (Verified petition, Oct. 17, 2011, exhibit 4, aff of Michael Pietranico ¶¶ 8-9.)
Eight more owners of NYICA member employers, from Staten Island, Queens, and throughout Long Island, New York, that are engaged in asphalt paving in New York City and employ Local 175 asphalt pavers echo NICO’s owner. A subsequent affidavit by Kilkenny also makes clear that, because the only Local 1010 members whom NYICA employers employ are concrete pavers, and NYICA employers do not employ any asphalt pavers who are Local 1010 members, no NYICA employers are benefit-ted by the Comptroller’s lower prevailing wages for asphalt pavers.
The NYICA officer and members demonstrate a tangible injury to their membership and to their employees. Through these witnesses, petitioners provide more detail than simply concluding that they have been deprived of job opportunities. *456 They do not pinpoint examples of when and where they have lost public work, which would be more illustrative of concrete cognizable harm and would be expected as the record develops beyond the pleading stage. (E.g. New York Propane Gas Assn. v New York State Dept. of State, 17 AD3d at 916.) Nevertheless, they do explain why and how specific employers and their employees have been injured. (Id. at 917.) At this stage they need not allege that harm actually has occurred, as long as they allege that they will be harmed or are threatened with injury from respondent Comptroller’s challenged actions, and the injury is more than hypothetical. (New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d at 214-215; Rudder v Pataki, 93 NY2d at 279; Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d at 412; Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y., 75 AD3d at 413.)
Respondent unions fault NYICA and its members for failing to specify that they lost a bid on a city public project and Local 175 for not identifying specific lost employment because of the lower prevailing wage. While lack of specificity may reduce the probative value of evidence, for pleading purposes those omitted details are inferable from the allegations that NYICA contractors have received “less public work” (verified petition, Oct. 17, 2011, exhibit 2, Kilkenny aff ¶ 14), since all sizable public works are subject to competitive bidding. (General Municipal Law § 103.) Moreover, even if NYICA contractors have lost no bids, the contractors would have lowered their profit margins to outbid contractors that pay the lower prevailing wages. Respondents’ criticism that affidavits of NYICA and its members date back to October 2010 likewise may bear on the continuity and thus the extent of petitioners’ injury, but does not establish that the affidavits are totally irrelevant, since the Comptroller’s reclassification and consequent prevailing wage schedule became effective July 1, 2010.
Similarly, the demonstrated injury to Local 175 members is not that they have been rejected for specific jobs, but that less jobs are available to them through their employers that have received less public work. As long as Local 175 members remain in their union they will receive their negotiated wages under their CBA, but if they leave their union to accept more jobs through different employers who pay only the lower prevailing wages, then they will receive those lower wages.
Finally, the fact that one job title encompassed in Local 175’s CBA may receive a higher wage under the prevailing wage *457 schedule than under the CBA does not so undermine the injury incurred by the vast majority of Local 175’s members as to deprive the organization of standing. (See Rudder v Pataki, 93 NY2d at 279.) As an organization, Local 175 is entitled to pursue the greater benefit to the membership as a whole. (See Marquez v Screen Actors, 525 US 33, 45-46 [1998]; Air Line Pilots v O’Neill, 499 US 65, 67, 77-78 [1991]; Steelworkers v Rawson, 495 US 362, 372 [1990].)
D. Conclusion
Consequently, the court denies respondents’ motions to dismiss the petitions based on petitioners’ lack of standing. (CPLR 3211 [a] [7]; 7804 [f]; see CPLR 3211 [a] [3].) Since standing is not merely a pleading requirement, but is also an indispensable element of petitioners’ proof, if ultimately petitioners fail to establish that their sworn allegations supporting their standing are true, or respondents otherwise rebut them, the petitions will fail. (E.g. Matter of Save the Pine Bush, Inc. v Common Council of City of Albany, 13 NY3d 297, 306 [2009]; see Lujan v Defenders of Wildlife, 504 US 555, 561 [1992].) As indicated above, when the record develops beyond the pleading stage, petitioners will be expected to pinpoint examples of when and where they have lost public work, to illustrate more explicitly that they have suffered concrete cognizable harm. (E.g. New York Propane Gas Assn. v New York State Dept. of State, 17 AD3d at 916.)
III. Dismissal Based on Petitioners’ Failure to State a Claim
Respondent unions also seek dismissal of both proceedings on the grounds that petitioners fail to allege a claim under CPLR 7803 (3) because the Comptroller’s classification of work and his prevailing wages based on that classification, as pleaded, are founded on facts, rational, and not arbitrary or biased as a matter of law. (CPLR 3211 [a] [1], [7]; 7804 [f].)
A. Undisputed Background Facts
For fiscal year 2011, from July 1, 2010, through June 30, 2011, the Comptroller initiated his reclassification of the prior separately classified trades of asphalt paver and of concrete paver into a single classification of paver and roadbuilderlaborer. The Comptroller also created subclassifications of production paver and different types of roadbuilders who perform paving using a paving machine. He then set the prevailing wages within this classification and its subclassifications using the CBA between GCA and respondent unions, because their CBA *458 covered at least 30% of the workers combined into that single trade of pavers and roadbuilders, whether performing concrete or asphalt paving, and petitioners’ CBA, covering only asphalt pavers, did not cover the requisite 30%. For fiscal year 2012, from July 1, 2011, through June 30, 2012, the Comptroller continued this reclassification and prevailing wage schedule based on this classification and its subclassifications, again using the CBA between GCA and respondent unions, which continued to cover 30% of the workers combined into the single reclassified trade, when petitioners’ CBA did not.
B. Petitioners’ Contentions
Petitioners contend that, if the classification were founded on facts, rational, and unbiased, it would classify asphalt pavers and concrete pavers separately, and then the prevailing wages for asphalt pavers would derive from petitioners’ CBA, because it covers at least 30% of all asphalt pavers, and no other union’s CBA covers at least 30%. No evidentiary facts in the petitions or supporting affidavits demonstrate that respondent Local 1010, by virtue of its predominance of concrete pavers, is not the predominant union in the classification combining all pavers and roadbuilders-laborers, whether working with asphalt or concrete. (New York Tel. Co. v New York State Dept. of Labor, 272 AD2d at 743.) Conversely, no facts presented by respondents, even were they permitted to rely on facts outside the petitions to support their dismissal under CPLR 3211 (a) (7), demonstrate that Local 1010 or Local 1018, because of both unions’ predominance of concrete pavers, would be the predominant union in a classification of asphalt pavers or of asphalt pavers and roadbuilders. (Lawrence v Graubard Miller, 11 NY3d 588, 595 [2008]; Solomons v Douglas Elliman LLC, 94 AD3d 468, 469 [1st Dept 2012]; Tsimerman v Janoff, 40 AD3d 242 [1st Dept 2007]; see Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]; 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002]; Leon v Martinez, 84 NY2d 83, 87-88 [1994]; Correa v Orient-Express Hotels, Inc., 84 AD3d 651 [1st Dept 2011].)
In refusing to accept the classification of all pavers and roadbuilders-laborers as predicated on the actual distinction of trades in practice, petitioners imprecisely contend that respondent Comptroller erroneously predicated his prevailing wages on the CBA of unions that did not predominate in the “trade.” Petitioners’ claim is not, however, that respondent Comptroller erroneously predicated his prevailing wages on the CBA of *459 unions that did not predominate among all pavers and roadbuilders-laborers: the predicate trade, according to the Comptroller. Petitioners’ claim is that pavers and roadbuilderslaborers are not an actual distinct trade, but asphalt pavers do form a distinct trade in practice, as do concrete pavers. Therefore the Comptroller erroneously predicated his prevailing wages on the CBA of unions that may have predominated in a classification that is not an actual trade, but those unions did not predominate among asphalt pavers, who are a trade.
The petitions and supporting affidavits and exhibits allege that, except for the Comptroller’s classifications for fiscal years 2011 and 2012, asphalt paving and concrete paving always have been recognized as separate trades in New York City. According to petitioners, who demonstrate training and knowledge in the fields, asphalt paving involves different functions and requires more specialized skills and tools and different machinery than concrete paving. (See New York Tel. Co. v New York State Dept. of Labor, 272 AD2d at 743.) Until Local 1018 merged with Local 1010 into a single union under Local 1010’s name in 2009, asphalt paving and concrete paving were performed by different unions that negotiated separate CBAs from unions performing concrete paving. These CBAs reflected the higher wages paid to asphalt pavers with the more specialized skills. Petitioners insist that, because Locals 1018 and 1010 merged for reasons unrelated to those skills or the functions involved in the unions’ work, those skills and functions remain distinct between the two forms of paving, which still are performed by different crews.
C. Petitioners’ Submissions to Respondent Comptroller Regarding His Proposed Schedule for Fiscal Year 2011
On June 3, 2010, petitioners submitted affidavits to the Comptroller challenging his proposed prevailing wage schedule for fiscal year 2011, to be effective July 1, 2010. One affidavit “describes the nature and scope of the asphalt paving work performed by members of Local 175.” (Verified petition, Aug. 9, 2010, exhibit 6 at 4 ¶ 1.) The witness, Local 175’s business manager Roland Bedwell, illustrates how the Comptroller’s subclassifications setting higher prevailing wages for production pavers and roadbuilders who use a paving machine do not apply in practice to asphalt paving or roadbuilding.
“It is erroneous to conclude that asphalt paving only includes what is known in the trade as ‘production paving.’. . . Production paving is only one form *460 of asphalt paving involving the spreading of large amounts of asphalt with a mechanized paving machine. The only difference between production paving and other types of asphalt paving is that in production paving a machine is utilized and requires a screedman. . . . For example, a tamper/shoveler, raker and wheelbarrow man are employed in all asphalt paving projects which do not involve any form of production paving. . . .
“More significantly, the Comptroller’s new classification unjustifiably narrows the protection of the prevailing wage law by limiting the class of protected workers solely to workers who perform production paving. Workers employed in the trade of asphalt paving perform many kinds of paving work which cannot be classified as production paving. The asphalt paving classification in the current Prevailing Wage Schedule is not limited to production paving and covers a much broader array of workers who perform asphalt paving. By the creation of this new classification, which is obviously intended to favor Local 1010, many individuals who previously were entitled to be paid prevailing wages will no longer be able to receive such wage rates.” (Verified petition, Aug. 9, 2010, exhibit 7 ¶¶ 19-20.)
The other affidavits concentrate on the political evolution of the separate and merged unions in asphalt paving and concrete paving. Insofar as petitioners submitted data to the Comptroller showing that Local 175 members performed most of the asphalt paving in New York City, that undisputed fact, as discussed above, misses the point if the trade in which the Comptroller is determining predominance is not asphalt paving. The data the Comptroller needed to consider pertained to the trade in which predominance was to be determined: all pavers and roadbuilders-laborers as one trade, asphalt pavers and road-builders as one trade and concrete pavers and roadbuilders as another, or other classifications.
D. Petitioners’ Submissions to Respondent Comptroller Regarding His Proposed Schedule for Fiscal Year 2012
On June 14, 2011, petitioners submitted affidavits to the Comptroller again challenging his proposed prevailing wage schedule for fiscal year 2012, to be effective July 1, 2011, and focussing more on the distinctions between trades. These affidavits included petitioners’ affidavits submitted in the first *461 proceeding for judicial review, including the affidavits now attached to the more recent petition, by Kilkenny and the NYICA employers of Local 175 asphalt pavers, describing their collective receipt of less public work and attributing that loss to the prevailing wage scheme. These submissions also included a letter dated May 16, 2011, from Local 175 to the New York State Department of Labor, reflecting petitioners’ positions in these proceedings for judicial review. Asphalt pavers are “a specialized trade that uses different skills and tools” from “concrete laborer work” (verified petition, Oct. 17, 2011, exhibit 9A at 2); the “skills for asphalt paving are separate, the training is different, and asphalt pavers have been paid more than concrete pavers because of the difficulty of the job.” (Id. at 3.)
Two affidavits submitted directly to the Comptroller at the administrative stage, as exhibit B to Local 175’s letter, support these conclusions. First, a certified trainer of “workers in all aspects of asphalt paving [and] concrete paving” (aff of Robert Smith ¶ 2, exhibit B to verified petition, Oct. 17, 2011; exhibit 9A), attests that each of his training courses for asphalt paving and concrete paving “was completely different in every important respect because asphalt paving and concrete paving constitute separate and distinct trades and use different tools, machinery, materials, methods and processes.” (Id. ¶ 4.) Local 175’s second witness, a union business manager, confirms that “[t]he asphalt paving and concrete trades use different tools, machinery, materials, methods and processes.” (Aff of Luciano Falzone ¶ 4, exhibit B to verified petition, Oct. 17, 2011, exhibit 9A.) The training for asphalt paving, as distinct from concrete paving, included “the use of specialized tools necessary to perform that type of work.” (Smith aff ¶ 6, exhibit B to verified petition, Oct. 17, 2011; exhibit 9A; see Local 363, Intl. Bhd. of Elec. Workers v New York State Dept. of Labor, 230 AD2d at 443-444.)
The trainer, Robert Smith, also illustrates how the Comptroller’s subclassifications setting higher prevailing wages for production pavers and roadbuilders who use a paving machine do not apply in practice to asphalt paving or roadbuilding, which includes nonproduction paving in the forms of temporary asphalt paving or utility asphalt paving. “Second, production asphalt paving never constituted a separate jurisdiction from other forms of asphalt paving. Third, much less skill and training are required by workers on a production asphalt paving crew as opposed to asphalt pavers performing temporary asphalt *462 paving or utility asphalt paving.” (Smith aff ¶ 5, exhibit B to verified petition, Oct. 17, 2011; exhibit 9A.)
“Asphalt paving spread through a machine (production paving) requires less skill than traditional asphalt paving due to the fact that the machine through the use of lasers and other technologies automatically levels the asphalt and requires less raking and tamping once the vibratory screed levels have been set. In contrast, work performed by hand is far more difficult because it requires the asphalt raker to rake and level the material without any electronic guides or vibratory screed in order to ensure that the grade of the finished course is set perfectly so that the rainwater will run to the appropriate location .... This technique is a very difficult process and requires a trained eye that cannot possibly be done by anyone without many years of experience.” (Id. ¶ 10.)
The “extraordinary amount of skill” required of asphalt rakers, shovelers, “whose job is to place the correct amount of material in precise locations so that the finished course does not have a low spot that creates puddles,” and tampers, “whose job is to seal the material,” explains why they command “a higher wage than other asphalt paving workers.” (Id.) “Asphalt pavers are generally trained to perform all aspects of asphalt paving,” whether “production asphalt paving (spread through a machine), temporary asphalt paving or utility asphalt paving,” because “there are always sections where a machine can’t be used.” (Id. ¶ 8.)
In fact the Comptroller’s subclassifications for production pavers and roadbuilders versus nonproduction pavers and road-builders do not apply in practice to concrete paving or road-building either. “The same is true for concrete paving whether it is production paving, patchwork paving or utility paving,” as “concrete pavers are trained to perform all aspects of concrete paving.” (Id.) Smith did not teach any of the raking, shoveling, or tamping skills applicable in asphalt paving, however, to concrete pavers. These skills “were not part of the concrete paving curriculum.” (Id. ¶ 10; see General Elec. Co. v New York State Dept. of Labor, 154 AD2d at 120; Local 363, Intl. Bhd. of Elec. Workers v New York State Dept. of Labor, 230 AD2d at 443-444.)
Both trainer Smith and the union business manager explain why respondent unions’ single CBA covering both asphalt pav *463 ers and concrete pavers does not undermine the premise that asphalt paving and concrete paving have been performed by different unions. Although the smaller Local 1018 merged into the larger Local 1010, the members of the original
“Local 1010 performed the paving when the applicable material was concrete, brick or block and Local 1018 performed the paving when the applicable material was asphalt. The members of each local also did the preparatory work .... Local 1010 members did the milling, grinding and saw-cutting of concrete and Local 1018 members did the milling, grinding and saw-cutting of asphalt . . . .” (Smith aff ¶ 9 and Falzone aff ¶ 5, exhibit B to verified petition, Oct. 17, 2011; exhibit 9A.)
Again, petitioners’ affidavits and data otherwise concentrated on the separate and merged unions’ evolution and the undisputed fact that Local 175 performed most of the asphalt paving in New York City. Those facts are related, but do not bear as directly on the rationality of classifying all pavers and roadbuilders-laborers as one trade, versus asphalt pavers and roadbuilders separately from concrete pavers and roadbuilders or another classification.
E. Submissions by Respondent GCA and Unions to the Comptroller
Respondent unions support their motion by controverting petitioners’ evidence, insisting that distinctions in job duties of concrete pavers versus asphalt pavers have blurred, such that they may be considered in one trade. This contrary position is dependent on evidence that asphalt work has changed to involve more preparation, which is at least 70% of each paving job and includes cutting and hammering out old concrete and concrete excavation, grading, and patchwork. Concomitantly, within the merged Locals 1010 and 1018 a prevalence of crews perform work using both concrete and asphalt, including asphalt milling, patching and filling in cracks with asphalt, and raking and shoveling asphalt. This evidence is principally outside the petitions and their supporting affidavits and exhibits. As set forth above, the court may not consider respondents’ evidence upon a motion pursuant to CPLR 3211 (a) (7).
These respondents as well do not demarcate precisely which such evidence was part of the Comptroller’s administrative record. They do not point to any particular submission to the Comptroller regarding his proposed prevailing wage schedule *464 for fiscal year 2011, when the Comptroller changed course from having previously classified asphalt pavers and roadbuilders separately from concrete pavers and roadbuilders. On May 25, 2011, respondent unions did submit an analysis of their evidence supporting the Comptroller’s proposed prevailing wage schedule for fiscal year 2012, which simply continued the schedule instituted the year before.
Respondents’ analysis dwells on the undisputed fact that asphalt paving is incorporated in a paving and roadbuilding trade throughout New York State outside New York City. This fact is persuasive, but does not dispose of characteristics that may warrant recognition of asphalt paving as a separate trade here: plausible examples range from the paving that may be needed for a higher density of streets bearing heavier traffic, to simply the sheer numbers of pavers and roadbuilders, whose lower numbers outside the City ‘may not warrant separation. This issue takes on significance where the “locality” is the reference point for the Comptroller’s determinations relating to prevailing wages. (NY Const, art I, § 17; Labor Law § 220 [3] [a], [b].)
Respondents’ analysis pokes holes in petitioners’ evidence, even though petitioners did not submit theirs until three weeks later, and contends that respondents’ contrary evidence shows the past separation was artificial. The evidentiary bases for the facts advanced by respondent unions, in any event, either are not in admissible documentary form or do not so utterly refute or completely negate petitioners’ allegations against respondents as to eliminate all material disputes regarding those facts. (CPLR 3211 [a] [1]; Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d at 326; 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d at 152; Correa v Orient-Express Hotels, Inc., 84 AD3d 651 [2011]; McCully v Jersey Partners, Inc., 60 AD3d 562 [1st Dept 2009]; see Greenapple v Capital One, N.A., 92 AD3d 548, 550 [1st Dept 2012]; Advanced Global Tech., LLC v Sirius Satellite Radio, Inc., 44 AD3d 317, 318 [1st Dept 2007]; 1911 Richmond Ave. Assoc., LLC v G.L.G. Capital, LLC, 60 AD3d 1021, 1022 [2d Dept 2009].) More importantly, nothing indicates whether respondent unions’ conclusions were also the Comptroller’s conclusions, let alone what the evidentiary bases for his conclusions were or that the Comptroller ever considered whether asphalt paving and concrete paving used different skills, tools, or machinery.
*465 F. The Administrative Record
The record here is grossly imprecise as to what data petitioners, respondent unions, or respondent GCA submitted directly to the Comptroller regarding the distinctions between trades, as part of his administrative decisionmaking process before he set the 2011 or 2012 prevailing wages, as opposed to the service of affidavits and exhibits on the Comptroller in this litigation. At minimum, absent the Comptroller’s answer including an administrative record “showing the grounds of the respondent’s action complained of’ (CPLR 7804 [d]), no party indicates what other comparable data was submitted to him or what data he considered. At this stage, the Comptroller has presented no record other than Labor Law § 220’s legislative history and has neither acknowledged nor denied receipt or consideration of such data, from the parties here or from nonparties.
Petitioners charge that the Comptroller adopted Local 1010’s lower wage rates specifically to assist Local 1010 by giving employers that employ Local 1010 members an advantage in bidding for public work, which would attract more workers to Local 1010’s membership. Petitioners’ witnesses like Bedwell, quoted above, launch this charge, that “this new classification . . . is obviously intended to favor Local 1010,” but their evidentiary showing is only that the classification’s effects, the advantage to employers of Local 1010 members in bidding for public work and Local 1010’s consequent attraction for new members, may suggest such an intent. (Verified petition, Aug. 9, 2010; exhibit 7 ¶ 20.) Absent the Comptroller’s administrative record, nothing indicates the Comptroller’s consideration of these potential effects or any other considerations that influenced his determination.
Regarding adoption of the challenged prevailing wage schedule for fiscal year 2011, when the Comptroller changed course from the previous separate classifications, the current record lacks any reasoning behind the Comptroller’s change, other than what petitioners claim its effects suggest. The record does not show that the Comptroller responded to petitioners’ submissions regarding his proposed prevailing wage schedules (verified petition, Aug. 9, 2010, ¶ 48), or published any explanation accompanying the published schedule. {Id., exhibit 1.)
Insofar as the Comptroller, through Assistant Comptroller Jeffrey Elmer, articulated the reasoning behind the Comptroller’s determination in responding to petitioners’ submissions regarding the proposed schedules and classifications for fiscal *466 year 2012, petitioners further charge that those reasons are pretexts for favoritism toward Local 1010 and GCA due to Elmer’s allegiances there. Partiality would be a basis for invalidating a determination and may find support in the administrative record, but also may require factual development beyond that record, through disclosure. (CPLR 408; Roth v Pakstis, 13 AD3d 194, 195 [1st Dept 2004]; People v Zymurgy, Inc., 233 AD2d 178, 179 [1st Dept 1996]; Margolis v New York City Tr. Auth., 157 AD2d 238, 243 [1st Dept 1990]; Matter of Niagara Mohawk Power Corp. v City of Saratoga Springs Assessor, 2 AD3d 953, 954 [3d Dept 2003].) Absent the administrative record, nothing establishes whether Elmer even participated in the determination of the prevailing wage schedules or classification of trades or was merely the mouthpiece for the Comptroller’s response to petitioners concerning proposals that other officials formulated.
Respondent unions point out that petitioners, knowing Elmer’s allegiances, never requested that Elmer remove himself from the decision making process. (See Matter of Corning Glass Works v Ovsanik, 84 NY2d 619, 626 [1994]; Matter of General Motors Corp.—Delco Prods. Div. v Rosa, 82 NY2d 183, 190 [1993]; Deluxe Homes of Pa. v State of New York Div. of Human Rights, 205 AD2d 394 [1st Dept 1994].) Without a record establishing Elmer’s involvement in the actual decision making, the current record is hardly dispositive that petitioners knew of his involvement such that his known allegiances might be influential. (See General Motors Corp.—Delco Prods. Div. v Rosa, 82 NY2d at 188-189; Matter of Beer Garden v New York State Liq. Auth., 79 NY2d 266, 278-279 [1992]; Matter of Rosenblum-Wertheim v New York State Div. of Human Rights, 213 AD2d 231, 232 [1st Dept 1995]; Matter of State Div. of Human Rights v Dorik’s Au Natural Rest., 203 AD2d 163, 164 [1st Dept 1994].)
In any event, the reasoning Elmer conveyed in the Comptroller’s response to petitioners is scant. While it may not suggest favoritism toward Local 1010 or GCA or other bias, referring to the merged Locals 1010 and 1018, he explains simply that “[m] embers of this single union perform asphalt paving and concrete paving . . . under the terms of a single collective bargaining agreement. Moreover, our view is consistent with the recent opinion issued by the New York State Department of Labor . . . .” (Verified petition, Oct. 17, 2011, exhibit 10 at 2.) The State Department of Labor opinion to which the Comptroller adhered concluded that “although Local 175 argues that the *467 task of asphalt paving is unique and specialized and must be considered separate from concrete paving, the norm is for the work to be performed by employees working under a single agreement covering both materials.” {Id. at 4.) This norm is “the practice throughout the rest of the State for this type of work.” {Id.)
Thus the Comptroller never disputes “that the task of asphalt paving is unique and specialized” such that it must be considered a separate trade from concrete paving. At most, he merely concludes that, because in one union in New York City and “throughout the rest of the State” employees under a single CBA perform asphalt paving and concrete paving, they are not separate trades. Although the Comptroller may use CBAs to classify trades, reliance exclusively on CBAs is reserved to the prevailing wage determination once work is classified into a trade and the predominant unions and employers whose CBA will be used are ascertained. (Lantry v State of New York, 6 NY3d at 56 and n 6; Matter of Otis E. Serv. v Hudacs, 185 AD2d 483, 485 [3d Dept 1992]; Liquid Asphalt Distribs. Assn. v Roberts, 116 AD2d at 297-298.) The fact that employees negotiate a single CBA may be an indicator that they are all in the same trade, but the CBA is hardly dispositive. (Matter of R.I., Inc. v New York State Dept. of Labor, 72 AD3d 1098, 1099 [2d Dept 2010]; Otis E. Serv. v Hudacs, 185 AD2d at 485.) As respondents acknowledge, the degree to which a union undertakes particular work does not control its classification. (Lantry v State of New York, 6 NY3d at 58 n 9.) Whatever data the Comptroller uses, the “emphasis” is to be “on examining the nature of the work for trade or occupation classification . . . given this Court’s pronouncement that the nature of the work performed is ‘[t]he pivotal question’ in reviewing . . . trade classifications.” (Lantry v State of New York, 6 NY3d at 57, quoting Matter of Kelly v Beame, 15 NY2d 103, 109 [1965].)
In sum, the nature of the work does not evolve from the separation or merger of unions. The separation or merger of unions may evolve from the nature of the work, in which case multiple CBAs or a single CBA likely would be an indicator of the nature of the work. If, on the other hand, the separation or merger of unions evolves from other phenomena, CBAs are largely irrelevant.
The approach reflected in the Comptroller’s response conflates trades with CBAs and treats one CBA as dispositive when, however the work covered is classified into trades, more than *468 one CBA covers that work. Such reasoning ignores “the inherent nature and characteristics of the work in question” (Lantry v State of New York, 6 NY3d at 56), the “work . . . actually performed,” which the Comptroller is required to determine, and the actual distinction of trades in practice. (Matter of Nash v New York State Dept. of Labor, 34 AD3d 905, 906 [3d Dept 2006]; see Kelly v Beame, 15 NY2d at 109; General Elec. Co. v New York State Dept. of Labor, 154 AD2d at 120; R.I., Inc. v New York State Dept. of Labor, 72 AD3d at 1099; Otis E. Serv. v Hudacs, 185 AD2d at 484-485.) This reasoning further ignores the mandates that prevailing wages for trades be determined “in accordance with the prevailing practices in the locality” (Labor Law § 220 [3] [b] [emphasis added]), “within the state where such public work is to be situated, erected or used.” (NY Const, art I, § 17 [emphasis added]; see Labor Law § 220 [3] [a]; Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d at 599-600; Beltrone Constr. Co. v McGowan, 260 AD2d at 873.)
The parties ask the court to decide whether the Comptroller “reasonably applied” (Chesterfield Assoc. v New York State Dept. of Labor, 4 NY3d at 605) “a reasonable methodology to evaluate” the job classifications relating to asphalt paving. (Id. at 604; see Lantry v State of New York, 6 NY3d at 55; Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor, 40 NY2d 158, 163-164 [1976]; A. Uliano & Son. Ltd. v New York State Dept. of Labor, 97 AD3d at 665-666.) At this stage the record does not establish whether the Comptroller evaluated the job classifications, let alone how, or whether he considered any factors, let alone what factors. The court must defer to the Comptroller’s expertise in classifying trades, but owes no deference if the classification “does not reflect ‘the nature of the work actually performed’ ” (Lantry v State of New York, 6 NY3d at 55 [citations omitted], quoting General Elec. Co. v New York State Dept. of Labor, 154 AD2d at 120, quoting Kelly v Beame, 15 NY2d at 109; A. Uliano & Son. Ltd. v New York State Dept. of Labor, 97 AD3d at 665; New York Tel. Co. v New York State Dept. of Labor, 272 AD2d at 743), and runs counter to the constitutional and statutory mandates focussing on the “locality” of the public work. (NY Const. art I, § 17; Labor Law § 220 [3] [a], [b]; see Roberts v Tishman Speyer Props., L.P., 13 NY3d 270, 285 [2009]; Metropolitan Movers Assn., Inc. v Liu, 95 AD3d at 598.)
A finding that asphalt pavers and concrete pavers are in the same trade or occupation is supportable if “made after a thor *469 ough investigation of the relevant trades and occupations.” (Matter of City of N.Y. Off. of Labor Relations v Comptroller of City of N.Y., 253 AD2d 596, 596 [1st Dept 1998].) Respondent unions characterize the Comptroller’s classification of paving and roadbuilding as based on engineering expertise. At this stage the record does not establish whether or how the Comptroller investigated the work in question; what evidence, if any, he weighed; what evidence, if any, he relied on; and whether he in fact used engineering expertise and exercised his fiscal officer’s discretion within the bounds of Labor Law § 220. To decide whether the Comptroller “reasonably applied” (Chesterfield, Assoc. v New York State Dept. of Labor, 4 NY3d at 605) “a reasonable methodology to evaluate” the job classifications for pavers and roadbuilders (id. at 604), an answer from the Comptroller, who issued the determination under review, at minimum, is necessary.
G. Conclusion
The survival of petitioners’ claims that the Comptroller’s determination was arbitrary, irrational, biased, or in violation of statutory or constitutional requirements must depend on the entire administrative record. (CPLR 7803 [3]; 7804 [f].) What may appear rational in a limited context may be rendered irrational when the record reveals abundant evidence directly to the contrary. (Matter of Camacho v Kelly, 57 AD3d 297, 299 [1st Dept 2008]; Matter of Albany Manor Inc. v New York State Liq. Auth., 57 AD3d 142, 144 [1st Dept 2008]; see Matter of Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d 100, 102 [1984].) While pieces of the record may comport with the applicable law, other parts may solidly support petitioners’ claims that the Comptroller reached his determination without any demonstration that asphalt paving and concrete paving were the same trade and through procedures and actions that violated the law. (Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d at 102; Camacho v Kelly, 57 AD3d at 299; Albany Manor Inc. v New York State Liq. Auth., 57 AD3d at 146; Develop Don’t Destroy Brooklyn v Empire State Dev. Corp., 31 AD3d 144, 150, 153 [1st Dept 2006].)
Without the administrative record, it is impossible to discern definitively whether it in fact shows supporting evidence, rationality, the absence of any bias or violation of Labor Law § 220 or article I, § 17 of the New York Constitution, and adherence to the factors and procedures that govern the classification *470 of trades and hence the prevailing wages for those trades. (E.g. A. Uliano & Son. Ltd. v New York State Dept. of Labor, 97 AD3d at 665-666.) The current record does not even establish the precise document that constitutes the final determination.
In sum, the court will not dismiss any claims on their merits before allowing respondent Comptroller to answer. (CPLR 7804 [f]; Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d at 102-103; Camacho v Kelly, 57 AD3d at 298; Develop Don’t Destroy Brooklyn v Empire State Dev. Corp., 31 AD3d at 153.) First, the facts currently are not so fully developed and presented as to establish the absence of any factual dispute bearing on the claims. (CPLR 409 [b]; 7804 [h]; 7806; Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d at 102-103; Camacho v Kelly, 57 AD3d at 298; Develop Don’t Destroy Brooklyn v Empire State Dev. Corp., 31 AD3d at 153.) Nor do the current facts demonstrate without dispute that the Comptroller’s determination was rational, unbiased, and reached through procedures and on grounds in full compliance with applicable law. (CPLR 7803 [3]; see CPLR 409 [b]; 7804 [f]; 7806; Nassau BOCES Cent. Council of Teachers v Board of Coop. Educ. Servs. of Nassau County, 63 NY2d at 102-103; Camacho v Kelly, 57 AD3d at 299; Albany Manor Inc. v New York State Liq. Auth., 57 AD3d at 145-146; Develop Don’t Destroy Brooklyn v Empire State Dev. Corp., 31 AD3d at 150, 153.)
IV Disposition
To recapitulate, the court denies the motions by respondents Liu, Highway and Street Laborers Local Union 1010, and Sheet Asphalt Workers Local Union 1018 to dismiss the petitions. (CPLR 3211 [a] [1], [7]; 7804 [f].) Respondent Liu shall serve and deliver to Part 46 at 71 Thomas Street, Room 204, any answers to the petitions within 30 days after service of this order with notice of entry, as he requested. {See CPLR 3211 [f]; 7804 [f].) Petitioners shall serve and likewise deliver any replies within 20 days after service of answers. {See CPLR 7804 [d], [f].) The court then will schedule a further hearing on the petitions to determine the extent of permanent relief to be granted.