OPINION OF THE COURT
Chief Judge Kaye.
Defendant New York State Department of Health routinely issues guidelines and advisories on a variety of health-related topics. Challenged on this appeal are the Department of Health’s “Clinical Guidelines for Office-based Surgery.” Plaintiff—a not- *210 for-profit corporation that represents more than 750 certified registered nurse anesthetists (CRNAs), nurses specially trained to administer anesthesia—seeks a declaration that these Guidelines are null and void because they are in fact regulations and defendants, the Department of Health, Commissioner of Health and Public Health Council, are without authority to regulate services provided in private physicians’ offices. We conclude that plaintiff lacks standing to maintain this action and reach no other issue.
The Guidelines
In 1997, defendants created a Committee on Quality Assurance in Office-Based Surgery in order to establish standards of care for the burgeoning, but unregulated, practice of surgeries performed in physicians’ offices. In December 2000—with defendants’ endorsement—the Committee issued the Guidelines that are the subject of this action.
The stated intent and goal of the Guidelines is to “ensure that the public is adequately protected when undergoing surgery/invasive procedures in private offices of health care practitioners.” The Guidelines include a broad range of recommendations for the qualification of practitioners and staff, equipment, facilities, ancillary services, and policies and procedures for patient admission, monitoring, discharge and emergency care. Most directly relevant to the present litigation, the Guidelines contain specifications regarding anesthesia administered in private offices—from conscious to unconscious/ deep sedation and general anesthesia. Among other things, the Guidelines suggest that CRNAs administering anesthesia to patients in doctors’ offices be supervised by a physician, dentist or podiatrist who is “physically present, [and] qualified by law, regulation or hospital appointment to perform and supervise the administration of the anesthesia and who has accepted responsibility for supervision.” The Guidelines also recommend that the supervising physician perform a preanesthetic examination, prescribe the anesthesia, remain physically present during the surgery and be “available for diagnosis, treatment and management of anesthesia-related complications or emergencies.”
Shortly before issuance of the Guidelines, plaintiff initiated this action seeking a declaration that the Guidelines are null and void because defendants’ authority to regulate surgery is limited under Public Health Law article 28 to hospital settings. *211 In their motion to dismiss, defendants urged both that the case was not ripe for review and that plaintiff lacked standing to mount this challenge. Assuming standing, Supreme Court denied defendants’ motion to dismiss, granted plaintiff summary judgment, and declared the Guidelines null and void as exceeding defendants’ authority. The Appellate Division correctly recognized that a grant of relief to plaintiff first requires resolution of the standing issue; explicitly found that plaintiff had standing; and agreed with Supreme Court that the Guidelines are regulations beyond defendants’ purview and thus illegal. In opposition to defendants’ appeal to this Court as of right under CPLR 5601 (b) (1), plaintiff argued that “[i]t is the statutory issue, i.e., whether the Department of Health exceeded the clear limits of its statutory authority, that is dispositive.” We dismissed defendants’ appeal as of right (100 NY2d 534 [2003]), granted their motion for leave to determine this issue (100 NY2d 510 [2003]) and now reverse.
Analysis
Standing is, of course, a threshold requirement for a plaintiff seeking to challenge governmental action. The two-part test for determining standing is a familiar one. First, a plaintiff must show “injury in fact,” meaning that plaintiff will actually be harmed by the challenged administrative action. As the term itself implies, the injury must be more than conjectural. Second, the injury a plaintiff asserts must fall within the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the agency has acted (see Society of Plastics Indus, v County of Suffolk, 77 NY2d 761, 773 [1991]; Matter of Colella v Board of Assessors, 95 NY2d 401, 409-410 [2000]). To establish standing, an organizational plaintiff—such as plaintiff here—must show that at least one of its members would have standing to sue, that it is representative of the organizational purposes it asserts and that the case would not require the participation of individual members. (See e.g. Rudder v Pataki, 93 NY2d 273, 278 [1999]; Matter of Dental Socy. of State of N.Y. v Carey, 61 NY2d 330, 333-334 [1984]; Matter of Dairylea Coop, v Walkley, 38 NY2d 6, 9 [1975].)
Although the Appellate Division determined standing by first looking to “zone of interests,” concluding that plaintiff’s members fall within the class of individuals protected by the constitutional and statutory provisions that are the basis for suit, we begin our analysis with the critical element of in-fact *212 injury—the requirement that plaintiff have an actual legal stake in the matter in dispute. Because we conclude that plaintiff has not shown in-fact injury entitling it to challenge defendants’ authority to issue the Guidelines, we need not reach the other components of standing.
The core of plaintiffs assertion of in-fact injury is that the Guidelines “effectively” require CRNAs to be supervised by anesthesiologists; that physicians would find it cost prohibitive to have both CRNAs and anesthesiologists during surgery; and that the Guidelines therefore “effectively” prohibit CRNAs from performing anesthesia services in an office-based setting. In short, according to plaintiff, the Guidelines “[ojbviously . . . restrict the scope of a CRNA’s area of practice.” Plaintiffs asserted injury rests on the following extract from the Guidelines:
“Anesthesia should be administered only by a licensed, qualified and competent practitioner. Registered professional nurses (RNs) who administer anesthesia as part of a medical, dental or podiatric procedure (including but not limited to CRNAs) should have training and experience appropriate to the level of anesthesia administered, and function in accordance with their scope of practice. Supervision of the anesthesia component of the medical, dental or podiatric procedure should be provided by a physician, dentist or podiatrist who is physically present, who is qualified by law, regulation or hospital appointment to perform and supervise the administration of the anesthesia and who has accepted responsibility for supervision. The physician, dentist or podiatrist providing supervision should:
“1. perform a preanesthetic examination and evaluation;
“2. prescribe the anesthesia;
“3. assure that qualified practitioners participate;
“4. remain physically present during the entire perioperative period and immediately available for diagnosis, treatment and management of anesthesia-related complications or emergencies; and
“5. assure the provision of indicated postanesthesia care.”
*213 The Appellate Division accepted plaintiffs assumption that CRNAs will likely be injured as “reasonable and sufficient to demonstrate a likelihood of actual injury” (301 AD2d 895, 898 [3d Dept 2003]). We conclude, however, that plaintiffs assumption lacks the concreteness required for “injury in fact”
Plaintiffs argument that CRNAs will likely be injured is founded on two layers of speculation—that the Guidelines will be rigorously enforced as regulations and that, as such, they will effectively harm CRNAs. At this juncture, it is not at all “obvious” that, even if enforced as regulations, the Guidelines would in fact injure any of plaintiffs members as claimed.
The Guidelines themselves do not explicitly restrict a CRNA’s area of practice; nor do they express any intent to do so. Rather, they explicitly provide for the continued employment of CRNAs so long as they have “training and experience appropriate to the level of anesthesia administered.” When executing a medical regimen, all nurses—including CRNAs working in a physician’s office—already must be supervised “by a licensed physician, dentist or other licensed health care provider legally authorized under this title” (Education Law § 6902 [1]; see also 1948 Ops Atty Gen 203 [“a nurse working under a physician, is entitled to administer general anesthesia”]; 48 State Dept Rep 137, 138 [1933] [a nurse does not violate the law if the nurse administers anesthesia “under the direction of a physician”]).
The Guidelines do not require anesthesiologist supervision, and do not prohibit operating physicians from themselves supervising CRNAs as they administer anesthesia. On the contrary, the Guidelines specifically recommend that the minimum number of available personnel during administration of conscious sedation should be two: “the practitioner performing the surgery and the individual monitoring the patient,” with analogous recommendations for regional and general anesthesia. Since the Guidelines allow nurses to administer all types of anesthesia, it is clear that the operating doctor can also be the supervising doctor. Furthermore, as defendants point out, the Guidelines recommend that the supervising physician be qualified by law to perform and supervise the administration of anesthesia, and a license to practice medicine under Education Law article 131 is the only credential required by law to perform a *214 medical procedure, including the administration of anesthesia.[1] These physicians may, as the Guidelines explicitly suggest, elect to participate in continuing education training in order to maintain high standards of quality.
The recommended procedures might, or might not, actually affect the employment of CRNAs in physicians’ offices. At this point, there is no certainty whatsoever that any CRNA would in fact be injured. That some physicians do not routinely or ordinarily perform measures now recommended in the Guidelines (as plaintiff argues) does not mean that physicians could not and would not themselves choose to do so, as opposed to firing CRNAs and hiring anesthesiologists.
Plaintiffs speculation about the future course the Guidelines might take cannot, under our precedents, supply the missing ingredient of in-fact injury. In Dental Society, we recognized the standing of an organization of licensed dentists to challenge a Medicaid dental fee reimbursement schedule, where dentist-members receiving reimbursements necessarily suffered actual economic loss from defendants’ failure over nearly 20 years to update the schedule. In Rudder, by contrast, there was no showing that any member of plaintiff organizations would be deprived of opportunities or entitlements. As we noted in affirming the dismissal of plaintiffs’ declaratory judgment action, standing requires a showing of “cognizable harm,” meaning that an individual member of plaintiff organizations “has been or will be injured”; “ ‘tenuous’ and ‘ephemeral’ harm ... is insufficient to trigger judicial intervention” (93 NY2d at 279).
While the record leads us to a different conclusion from the dissent, we are unanimous in our commitment to predictability in the law of standing, starting with the element of in-fact injury.[2] Consistent with our precedents, we conclude that, on this record, plaintiff has failed to demonstrate an in-fact injury sufficient to meet the first prong of the test for standing. That *215 in the future the hypothesized harm might befall CRNAs does not at this time entitle plaintiff to maintain this action.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the complaint dismissed.

. Defendants do not suggest that the Guidelines are “meaningless” or “redundan[t]” (dissenting op at 219, 220), only that they would not operate as plaintiff projects, underscoring the abstract quality of plaintiffs complaint.

. Addressing the dissent, we note that standing may indeed be a complicated subject, posing close and difficult issues that divide the Court. Our jurisprudence, however, represents not a black box from which we conjure a desired result, but an effort to articulate, and consistently apply, sound, logical principles that assure that courts’ decisions will be neither abstract nor advisory. That may at times mean dismissing a well-intentioned plaintiff who prematurely commences suit, or agreeing with a defendant who, in its briefs, places greater emphasis on other issues.