[911 NYS2d 570]

In the Matter of JOHN SAMUELSEN, Individually and as President of Local 100, Transport Workers Union of Greater New York, et al., Petitioners, v DAVID YASSKY, as Chair of the New York City Taxi and Limousine Commission, et al., Respondents.

Supreme Court, New York County, August 12, 2010

## APPEARANCES OF COUNSEL

*Schwartz, Lichten & Bright, P.C.*, New York City (*Arthur Z. Schwartz* of counsel), for petitioners. *Michael A. Cardozo*, Corporation Counsel, New York City (*Michelle Goldberg-Cahn* of counsel), for respondents.

### OPINION OF THE COURT

Anil C. Singh, J.

Petitioners move by order to show cause pursuant to CPLR article 78 for an order enjoining and restraining respondents: (a) from proceeding with their "Group Ride Vehicle Pilot Program" (the pilot program) pursuant to which commuter vans and for-hire vehicles can pick up passengers on former bus routes, without such pickups being prearranged through a base; (b) from suspending Rules of Taxi and Limousine Commission (35 RCNY), chapter 6 ("For Hire Vehicles"), § 6-12.1 (f) and § 6-16 (f) and chapter 9 ("Commuter Vans"), § 9-10 (d) and (e) (2), or any other state or local law, ordinance or regulation as part of the pilot program; and (c) from taking other actions which allow commuter vans and other livery vehicles from picking up

multiple passengers on New York City streets which are not prearranged through a base. Respondents oppose the motion.*

The petitioners are Local 100, Transport Workers Union of Greater New York, its president, John Samuelsen (collectively the TWU) and a nonprofit community group, New York Communities for Change, Inc. The union's members include laid-off bus drivers and bus mechanics. They seek to enjoin respondents David Yassky, in his capacity as Chair of the New York City Taxi and Limousine Commission, and the City of New York (collectively the TLC) from implementing a pilot program testing the viability of a new class of for-hire transportation service that will pick up passengers along certain bus routes in New York City (the City) where the New York City Transit Authority (NYCTA) (also referred to herein as the Metropolitan Transportation Authority [MTA]) is no longer providing bus service.

On or about July 9, 2010, the TLC issued a notice giving interested parties an opportunity to participate in the pilot program (petitioner's exhibit B). The program is to begin on August 15, 2010, and is expected to last for one year. However, the pilot program may be terminated by the TLC at any time of its choosing. The participants in the program will allow owners of transportation businesses, including "commuter van services and for-hire vehicles, . . . to test the use of a new class of for-hire service which will provide a fixed-fare group ride among designated pick up and drop off locations." (Petitioner's exhibit B at 1.) The service areas will be locations where there has been a reduction in transportation options as a result of service cuts by the MTA. The TLC's stated purpose for the pilot program is to test the demand for fixed-fare group ride for-hire fare service.

The new for-hire service is to be provided on former MTA bus routes, including B23, B39, B71, Q74 and Q79. There will be designated fixed stopping points within the service area; however, passengers may negotiate with drivers for other drop-off destinations.

Special licenses will be needed to participate in the program. The vehicles must accommodate between 6 and 20 passengers, not including the driver. The vehicles will be required to carry insurance at the limits applicable to commuter vans. Passengers will be charged a fixed rate with a preference being given to proposers charging two dollars or less.

Petitioners must meet a three-fold test in order to obtain a preliminary injunction. They must demonstrate a likelihood of

---

* Oral argument was heard on the record on August 6, 2010.

success on the merits, irreparable injury, and a balancing of the equities in their favor (*see* 13 Weinstein-Korn-Miller, NY Civ Prac ¶ 6301.05, at 63-5 [2d ed]).

In order to obtain injunctive relief, petitioners must establish a clear likelihood of ultimate success on the merits (*W.T. Grant Co. v Srogi*, 52 NY2d 496, 517 [1981]). The TLC urges that petitioners are not likely to succeed on the merits because they lack standing to bring this article 78 proceeding.

▮ The test of whether an organization has standing to challenge action by a government agency was summarized by the Court of Appeals in *New York State Assn. of Nurse Anesthetists v Novello* (2 NY3d 207 [2004]). There, the Court wrote:

> "Standing is, of course, a threshold requirement for a plaintiff seeking to challenge governmental action. The two-part test for determining standing is a familiar one. First, a plaintiff must show 'injury in fact,' meaning that plaintiff will actually be harmed by the challenged administrative action. As the term itself implies, the injury must be more than conjectural. Second, the injury a plaintiff asserts must fall within the zone of interests or concerns sought to be promoted or protected by the statutory provision under which the agency has acted. To establish standing, an organizational plaintiff—such as plaintiff here—must show that at least one of its members would have standing to sue, that it is representative of the organizational purposes it asserts and that the case would not require the participation of individual members." (*Nurse Anesthetists*, 2 NY3d at 211 [citations omitted].)

To determine whether a party has standing, the court must examine the relevant statutes and precedents in order to ascertain the presence or absence of a legislative intention to preclude review (*see for example Matter of George v Bloomberg*, 2 AD3d 294 [1st Dept 2003]). "Only where there is a clear legislative intent negating review or lack of injury in fact will standing be denied" (*Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 11 [1975] [citations omitted]). A labor union may have standing to bring an article 78 petition against a governmental entity (*see for example Mulgrew v Board of Educ. of the City School Dist. of the City of N.Y.*, 275 AD3d 412 [1st Dept 2010]).

In order for a labor union to have standing to bring an article 78 proceeding, the union must demonstrate: (1) that some or all of its members have standing to sue; (2) that the interests

advanced in the case are sufficiently related to the union's organizational purposes to satisfy the court that the union is an appropriate representative of those interests; and (3) that the participation of the individual members is not required to assert the claim or to afford the union complete relief (*id.*).

In the instant matter, respondents contend that the TWU does not have standing to maintain this article 78 proceeding since it cannot establish an injury in fact stemming from the challenged pilot program.

Petitioners counter that implementation of the TLC plan will harm members of the union because the commuter vans will operate along suspended bus routes. Petitioners assert that this will discourage the MTA from restoring the bus routes and rehiring bus drivers who have been laid off.

We agree with the petitioners. Accordingly, the court finds that: (1) petitioners have standing to challenge the TLC's pilot program as they will suffer injury as a result of the TLC's actions; (2) John Samuelsen, as president of the TWU, has standing to sue; and (3) the interests the TWU seeks to promote in this article 78 proceeding—the protection of jobs—is related to the union's organizational purpose.

■ Turning to the merits, petitioners maintain that the pilot program violates section 80 (5) (a) (2) of the Transportation Law, which requires the City to adopt a local law or ordinance that prohibits van service or other common carriers from soliciting, picking up or discharging passengers at stops or along routes which were traveled by a bus line operated by the Transit Authority.

Section 80 (5) (a) (2) provides, in relevant part, as follows:

> "Such local law or ordinance shall prohibit a van service or other such common carrier of passengers . . . from soliciting, picking up or discharging passengers at stops of, or along a route which is traveled upon by, a bus line which is operated by a transit authority or such city or a private bus company approved by such city to operate pursuant to a local law, ordinance or charter provision enacted in accordance with subdivision four of this section . . . ."

Section 2 (35) of the Transportation Law defines "van service" as

> "a sub-classification of common carrier of passengers by motor vehicle that provides service on a

prearranged regular daily basis between a zone in a residential neighborhood and a location which shall be a work related central location, a mass transit or mass transportation facility, a shopping center or recreational facility . . . ."

The Group Ride Vehicle Pilot Program does not fall within the above definition of "van service" as it contemplates fixed stopping points on bus routes. Service is not between a residential neighborhood and mass transit or transportation facility, a shopping center or recreational facility.

Our inquiry does not end here, because section 80 (5) (a) (2) also prohibits "other such common carrier of passengers" from soliciting, picking up or discharging passengers at stops of, or along routes which are traveled upon by, a bus line operated by the transit authority.

Common law defines the term "common carrier" as "one who carries passengers as well as one who carries goods, either when he carries the passenger and his merchandise or baggage or when he carries a traveler without his goods." (*Anderson v Fidelity & Cas. Co. of N.Y.*, 228 NY 475, 482 [1920].) Moreover, under Transportation Law § 2 (7), " 'Common carrier of passengers by motor vehicle' means any person that transports passengers by motor vehicle for compensation by providing service for the general public on an individual fare basis over regular or irregular routes." The for-hire vehicles in the pilot program clearly fall within this broad definition of common carrier of passengers.

However, the prohibition from soliciting, picking up or discharging passengers at stops under section 80 (5) (a) (2) of the Transportation Law applies "along a route which is traveled upon, by a bus line which is operated by a transit authority." The meaning of the word "is" in this statutory context is the present operation of a bus along a bus route. The dictionary defines the word "is" as the "third person singular present indicative of 'be' " (The American Heritage Dictionary of the English Language 954 [3d ed]). Therefore, whether the service cuts stopping bus service on certain bus routes are characterized as "suspended" by petitioners or "discontinued" by respondents, in fact, MTA buses are not presently traveling on currently operating bus routes in the service areas designated by the pilot program. Additionally, drop-off points are not limited to bus routes, for passengers may be dropped off at locations that are not fixed stopping points within the service area.

Our interpretation of Transportation Law § 80 (5) (a) (2) is consistent with the legislative history of the statute. A 1992 Governor's approval memorandum states, "we must remember that . . . van services . . . provide an important transportation option to the public. These vans are especially valuable to residents of those areas of New York City, such as certain portions of Staten Island, where extensive mass transit service is not available" (Governor's Mem approving L 1992, chs 853, 854, 1992 McKinney's Session Laws of NY, at 2931, 1992 NY Legis Ann, at 555). A memorandum issued by the New York Department of Transportation (NYDOT), dated July 7, 1982, states that it is essential to clearly define the role of the for-hire privately owned passenger carrier industry "[i]n order to avoid substantial passenger diversion from the existing subsidized mass transportation systems, and possible disruptions to those systems . . . . At the same time it is necessary to be sensitive to the needs of the public that do not have reasonable access to the mass transportation facilities" (NYDOT Mem, Bill Jacket, L 1983, ch 635, at 29).

Accordingly, the pilot program does not violate section 80 (5) (a) (2) of the Transportation Law.

Second, petitioners maintain that 35 RCNY 6-12.1 (f) and 6-16 (f) prohibit for-hire vehicles from soliciting or picking up passengers by any means other than prearrangement through a licensed base. Furthermore, 35 RCNY 9-10 (d) and (e) (2) prohibit commuter van drivers from picking up or discharging passengers along a route traveled by a bus which is operated by the NYCTA. Thus, the TWU argues that the TLC has improperly suspended the regulations pertaining to the pickup and discharge of passengers by for-hire vehicles and commuter vans.

The TLC counters that New York City Charter § 2303 (b) (9) authorizes pilot programs, such as the Group Ride Vehicle Pilot Program, which are inconsistent with TLC regulations. Under the City Charter, the TLC's jurisdiction to regulate and supervise the transportation industry includes the following:

"The development and effectuation of a broad public policy of transportation affected by this chapter as it relates to forms of public transportation in the city, including innovation and experimentation in relation to type and design of equipment, modes of service and manner of relation to type and design of equipment, modes of service and manner of operation, which for limited purposes and limited periods

of time may depart from the requirements otherwise established for licensed vehicles pursuant to this chapter" (NY City Charter § 2303 [b] [9]).

The pilot program is an experiment to determine the demand by the public for fixed-fare, group ride, for-hire service and whether such service can help the City fill in gaps within the transit network. The program is limited to five nonoperational bus routes and is for a limited period of time (one year or less).

The court holds that NY City Charter § 2303 (b) (9) authorizes the TLC to depart from the regulations relating to modes of service and the manner of operation to test the efficacy of the pilot program.

Third, petitioners argue that the TLC grants the owners and operators of for-hire vehicles and commuter vans selected to participate in the pilot program a franchise without following the procedures set forth in section 363 of the City Charter requiring approval by the City Council.

Section 6-202 of the Administrative Code of the City of New York prohibits a bus line from operating omnibus routes for public use routes within the City without a franchise. The for-hire vehicles in the pilot program do not fall within the definition of a bus line, which is defined as "a sub-classification of common carrier of passengers by motor vehicle that is usually characterized by the use of vehicles having a seating capacity of greater than twenty passengers; by multiple pickup and discharge points along designated routes; and by no prearrangements or reservations by passengers" (Transportation Law § 2 [3]).

The vehicles participating in the pilot program are limited to a capacity of 6 to 20 passengers, not including the driver. Further, passengers may be dropped off at locations other than ones along a designated route.

Similar to the granting of licenses to taxicabs, the TLC under chapter 65 of the NY City Charter may also grant a license to for-hire vehicles under its power to regulate and supervise "the business and industry of transportation of persons by licensed vehicles for hire in the city" (NY City Charter § 2303 [a]).

The TLC is awarding a limited license, and not a franchise, to owners of vehicles selected to participate in the pilot program.

For these reasons, the court holds that petitioners are not likely to succeed on the merits. The pilot program does not violate section 80 (5) (a) (2) of the Transportation Law. Furthermore, the TLC has the authority to depart from the

regulatory requirements prohibiting for-hire vehicles from soliciting or picking up passengers by any means other than prearrangement and from commuter vans picking up or discharging passengers along nonoperational bus routes. Finally, the program does not grant a franchise but, rather, a license to commuter vans and for-hire vehicles to operate along a limited number of bus routes that are no longer being serviced by the MTA.

Petitioners assert that unless the court stays the TLC's pilot program, the riding public will suffer immediate and irreparable injury "in that laws designed to protect public safety will go unenforced and the NYCTA will be discouraged from restoring service and rehiring laid-off drivers."

To warrant injunctive relief, the allegations of irreparable injury to the petitioner must be supported by the facts or circumstances presented (*Niagara Falls Power Co. v White*, 292 NY 472 [1944]). "An injury is irreparable when it cannot be adequately compensated for in damages, or when there is no certain pecuniary standard for the measurement of damages" (67A NY Jur 2d, Injunctions § 18, citing *Poling Transp. Corp. v A & P Tanker Corp.*, 84 AD2d 796 [2d Dept 1981] and *Haulage Enters. Corp. v Hempstead Resources Recovery Corp.*, 74 AD2d 863 [2d Dept 1980]). A petitioner must show that the injury is threatened and imminent (*Niagara Falls*, 292 NY at 481). "What constitutes an imminent threat of irreparable injury . . . will depend not only upon the facts of the individual case but also upon the discretion of the court" (*Suffolk County Assn. of Mun. Empls. v County of Suffolk*, 163 AD2d 469, 472-473 [1990]).

Here, the court finds that irreparable injury has not been shown. The pilot program has rules regarding insurance and licensing of drivers. No safety rules will be suspended. For example, the "Notice of opportunity to participate" in the pilot program specifically states that

> "participants, including vehicles and drivers, should expect to be held to standards of conduct and safety of operation that are similar to those in effect for all TLC licensees. Participants who fail to continue to meet such standards will be subject to license termination and the end of such participant's participation in the pilot" (verified petition, exhibit B, at 2, para 2 [a]).

With respect to insurance, the notice states, "Vehicles will be

required to be insured within minimum insurance limits currently applicable to commuter vans" (verified petition, exhibit B, at 2, para 2 [b] [1]). Furthermore, all drivers will be required to demonstrate that they "hold a current, valid, unsuspended and unrestricted state driver's license authorizing them to drive the type and size of vehicle they will be driving in the pilot" (verified petition, exhibit B, at 3, para 2 [b] [ii]). Finally, the notice states that "DMV suspension or revocation of the underlying driver's license will result in termination of the special TLC pilot driver's license" (*id.*).

Therefore, the program is not a threat to public safety.

The court empathizes with the union members laid off as a result of the MTA's service cuts. However, given the limited scope of this pilot program, the TWU has not suffered imminent harm.

Finally, the equities do not balance in favor of petitioners. I recognize that as a result of the service cutbacks on approximately 32 bus lines, many TWU bus drivers and bus mechanics have lost their jobs, taking a toll on working men and women and their families. However, this loss must be balanced against the needs of the many thousands of New Yorkers throughout New York City who have lost bus service. These working men and women and their families need a safe, reliable and cost-effective means of alternative transportation. The Group Ride Vehicle Pilot Program is an experiment to see if that void can be filled.

For the above reasons, the preliminary injunction is denied.