Matter of New York Taxi Workers Alliance v New York City Taxi & Limousine Commission (2025 NY Slip Op 06551)

Matter of New York Taxi Workers Alliance v New York City Taxi & Limousine Commission

2025 NY Slip Op 06551

Decided on November 25, 2025

Appellate Division, First Department

Higgitt, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: November 25, 2025
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Troy K. Webber
Barbara R. Kapnick Ellen Gesmer John R. Higgitt Shlomo S. Hagler

Index No. 154424/23|Appeal No. 4728|Case No. 2024-02398|

[*1]In the Matter of New York Taxi Workers Alliance, et al., Appellants,
v
The New York City Taxi & Limousine Commission, et al., Respondents.

Petitioners appeal from a judgment (denominated an order) of the Supreme Court, New York County (Nicholas W. Moyne, J.), entered on or about March 29, 2024, denying their petition to, among other things, vacate and annul, and enjoin respondents' implementation of, the Street Hail Livery pilot program, and implicitly dismissing their proceeding brought pursuant to CPLR article 78 due to lack of standing.

New York Taxi Workers Alliance, Long Island City (Allison Langley and Zubin Soleimany of counsel), for petitioners.
Muriel Goode-Trufant, Corporation Counsel, New York (Jamison Davies and Devin Slack of counsel), for respondents.

Higgitt, J.

On this appeal, we are asked to determine whether petitioners, an association representing the interests of drivers of vehicles for hire in New York City and two individual drivers, have standing to challenge a pilot program initiated and regulated by the Taxi and Limousine Commission of the City of New York (the TLC) that, petitioners assert, runs afoul of a local law. For the reasons that follow, we conclude that petitioners have standing to maintain their proceeding.
I.
A.
Vehicles for hire provide vital transportation services in the City of New York. The TLC is the administrative agency responsible for licensing and regulating the several classes of those vehicles (see NY City Charter § 2300 et seq.; Matter of Melrose Credit Union v City of New York, 161 AD3d 742, 742-743 [2d Dept 2018]), each of which is subject to different rules of operation.
One class is comprised of the iconic yellow taxicabs, which operate under a transferrable medallion, are metered vehicles that must charge uniform rates set by the TLC, and have the exclusive right to accept "street hails" anywhere in the City (see Greater N.Y. Taxi Assn. v State of New York, 21 NY3d 289, 296-297 [2013]; see also Administrative Code of City of NY § 19-502[h], [l]). The New York City Council has the authority to limit the number of medallions, and has done so (see Greater N.Y. Taxi Assn., 21 NY3d at 297).
For-hire vehicles (FHVs) represent a broad, separate class of vehicles licensed and regulated by the TLC (see Administrative Code § 19-502[g]). Traditionally, FHVs were prohibited from accepting street hails and accepted passengers by prearrangement (see Greater N.Y. Taxi Assn., 21 NY3dat 296-297). The main subclass of FHVs is livery cars; other subclasses include "black cars" that generally serve business clients and luxury limousines (see Administrative Code § 19-502[u], [v]). Each FHV must be affiliated with a base authorized to dispatch vehicles within the vehicle's subclass (see Greater N.Y. Taxi Assn., 21 NY3dat 297-298). The fares for FHVs are set by base owners, not the TLC, although base owners must submit their rate schedules to the TLC. Prior to the 2018 enactment of the local law that is at the center of this action and which will be discussed below, the TLC issued new FHV licenses on a rolling basis with no limits.
Yellow taxicabs are ubiquitous in midtown and lower Manhattan ("Manhattan's central business district" [id. at 296]),[FN1] and at John F. Kennedy Airport and LaGuardia Airport. The yellow taxicabs, however, provided relatively few rides originating in uptown Manhattan and the outer boroughs. The exclusivity of the yellow taxicabs' right to accept street hails and their lack of meaningful presence outside of Manhattan's central business district and the airports created street-hail deserts in uptown Manhattan and the outer boroughs.
B.
In 2011, the Legislature intervened, passing the HAIL Act (L 2011, ch 602, as amended by L 2012, ch 9). The Act authorized the TLC to issue a new subclass of FHV license: a hail-accessible interborough license, colloquially referred to as a street hail livery (SHL) license (see Greater N.Y. Taxi Assn., 21 NY3d at 297-298). An SHL, which is a hybrid of a yellow taxicab and a FHV, can accept street hails in uptown Manhattan and the outer boroughs (see id.). Additionally, an SHL can accept a prearranged trip, including one ending in Manhattan's central business district or originating at the airports (see id. at 298). An SHL, like the yellow taxicab, must have a taximeter, a partition, a trip-record system, and a light on its roof indicating whether the vehicle is available to accept passengers. An SHL, however, has its own distinctive green color.
The HAIL Act authorized the issuance of 18,000 SHL licenses (see id. at 297). Yet the TLC has issued only 8,341 SHL licenses, of which approximately 80% are expired or have been surrendered or suspended. Thus, only approximately 8% of the 18,000 SHL licenses authorized by the HAIL Act are in use.
According to the TLC, interest in SHL licenses was stunted by the proliferation of app-based ridesharing services, which operate as FHVs. App-based ridesharing services such as Uber and Lyft coupled the flat-rate fare advantage of a traditional FHV with the ease of hailing a vehicle by mobile application. This combination proved to be enticing to FHV passengers, creating a surge in demand for new FHV licenses tied to app-based ridesharing vehicles (see Matter of Melrose Credit Union, 161 AD3d at 744). By the mid-2010s, app-based ridesharing services dominated the FHV class.
C.
The rise of the app-based ridesharing FHV and its dominance of the FHV market did not escape the attention of the City Council. In April 2018, the Council's Committee on For-Hire Vehicles issued a report on various bills relating to yellow taxicabs and FHVs (see Council of City of NY, Comm. Rep. of Human Servs. Div., Comm. on For-Hire Vehicles, Apr. 30, 2018). The Committee observed that:
"[t]he taxi and for-hire vehicle sectors have gone through significant changes in the last several years as technological innovations have altered the traditional way people signaled taxis and arranged for-hire vehicle trips. Today, application-based technology has allowed passengers to have fast, reliable, and on-demand service at the click of a button. While these companies abide by TLC's licensing requirements and operate as for-hire vehicles, the sector's rapid growth over the past several years has led to economic and environmental concerns that some argue need to be addressed" (id. at 3 [emphasis added]).
The Committee found that, between 2011 and 2017, the number of FHVs increased from 39,708 to 102,536, and, at the time of the Report, the TLC was processing 2,000 FHV license applications per month. These spikes were driven by the app-based ridesharing craze. During an April 18, 2018 public hearing on the Committee's proposed bills, various Council members and drivers commented on the oversaturation of FHVs serving the City; that the dramatic increase in FHVs was not accompanied by a commensurate increase in passenger trips; that drivers' expenses were increasing at the same time that their incomes were decreasing; and that drivers were generally struggling to make a living (see tr. of minutes of Comm. on For-Hire Vehicles, Apr. 30, 2018).
In August 2018, following additional public hearings by the Committee on For-Hire Vehicles and the full City Council, and an additional, augmented Committee report highlighting, among other things, the deleterious impact that unsustainable growth in the app-based FHV sector was having on drivers' income and well-being (see Council of City of NY, Comm. Rep. of Human Servs. Div., Comm. on For-Hire Vehicles, Aug. 8, 2018, at 6-14), the City Council passed, and the Mayor signed into law, a number of local laws addressing various issues regarding vehicles for hire and their drivers. One of those laws, Local Law 147, is at the center of this appeal.
Section 1 of Local Law 147 imposed a 12-month pause on the issuance of new FHV licenses, subject to certain limited exceptions. Section 3 of the law added a new § 19-550 to title 19, chapter 5 of the Administrative Code of the City of New York. Section 19-550(a) directed the TLC, within 12 months, to study:
"(i) income drivers derive from operating vehicles that provide transportation services to passengers, (ii) traffic congestion throughout the city, (iii) the extent to which various categories of vehicles for hire contribute to such congestion, (iv) traffic safety, (v) vehicle utilization rates, (vi) access to services in different geographic areas of the city for one or more categories of vehicles for hire, (vii) the number of hours that drivers have made themselves available to accept dispatches from a base or from a high-volume for-hire service by day or week, (viii) driver income and well-being, and (ix) such other topics as the [TLC] and the [City] department of transportation deem appropriate" (Administrative Code § 19-550[a]; see 35 RCNY 59A-06[a][1]).
The TLC was also directed to "review the number of for-hire vehicle licenses on a periodic basis, but not less than once annually," and empowered, based on such review, to "regulate the number of for-hire vehicle licenses issued" (Administrative Code § 19-550[b][2]). Lastly, Administrative Code § 19-550(c) allows the TLC to vary the number of for-hire vehicle licenses issued:
"by geographic area of the city, time of day, day of the week, whether a vehicle is a wheelchair accessible vehicle or a low- or zero-emission vehicle and by such other factors as the [TLC] deems appropriate to address traffic congestion, shared rides, traffic safety, vehicle emissions, for-hire vehicle ridership, the income drivers derive from providing transportation services to passengers and the availability of for-hire vehicle services in different geographic areas of the city."
D.
Starting in September 2022, the TLC, relying on its power to engage in "innovation and experimentation in relation to type and design of equipment, modes of service and manner of operation, which for limited purposes and limited periods of time may depart from the requirements otherwise established for licensed vehicles" (NY City Charter § 2303[b][9]; see 35 RCNY 52-21[a]), considered potential options to revitalize the struggling SHLs. The TLC found that there was meaningful demand for FHVs in uptown Manhattan and the outer boroughs, but start-up costs associated with SHLs (i.e., costs incurred converting vehicles to accept street hails, such as painting and installing taximeters and roof lights) deterred individuals and entities from seeking SHL licenses. Seeking to increase FHV service in uptown Manhattan and the outer boroughs, and to increase the number of non-app-based ridesharing FHVs, the TLC wanted to test whether SHLs could be used safely and efficiently without being equipped to accept street hails. The TLC believed that by removing a SHL's ability to accept a street hail and thereby eliminating the need for a licensee to incur start-up costs, more individuals and entities would be interested in obtaining SHL licenses and ultimately operating in underserved areas. The TLC authorized the pilot program on May 3, 2024, allowing for up to 2,500 participants who would provide prearranged service that could not begin in the Manhattan central business district, and who could not accept street hails. So far, the TLC has 555 participants in the pilot program.
II.
Petitioners — an organization representing yellow taxicab and FHV drivers, a yellow taxicab driver, and an app-based ridesharing FHV driver — commenced this CPLR article 78 proceeding, seeking a judgment annulling the pilot program, declaring that the pilot program contravenes the HAIL Act and Local Law 147, and enjoining the TLC from implementing the pilot program. Petitioners maintained that the pilot program permitted the TLC to issue up to 2,500 FHV licenses for a novel form of SHL, notwithstanding the requirements of Local Law 147 and its implementing regulations, which limit the TLC's ability to issue FHV licenses. Specifically, petitioners complained that the pilot program did not require the TLC to conduct the review specified by Administrative Code § 19-550, and would result in additional FHVs on City streets. According to petitioners, these additional FHVs would join an already-saturated FHV fleet, leaving current drivers with less work and lower incomes. With respect to the harm or injury threatened by the pilot program, petitioners alleged, based on their interpretation of certain industry data, that the addition of 2,500 FHVs on City streets would lead to a loss of up to 6% of net income per current driver, representing a significant blow to the wallets of generally low-income-earning drivers.[FN2]
In answering the petition, respondents (the TLC, its chairman, and the City) denied that the pilot program conflicted with State or local law, and maintained that the TLC was authorized to develop and implement the program under NY City Charter § 2303(b)(9) and the pertinent Rules of City of New York (35 RCNY 52-21 et seq). Respondents asserted a number of affirmative defenses, including that petitioners lacked standing to bring the proceeding.
III.
Supreme Court concluded that petitioners failed to demonstrate that they had standing, and denied the petition on that basis. The court wrote, in relevant part, that:
"the petitioners assert that the pilot program will cause an oversaturation of the market for drivers for-hire without increasing the demand for such drivers, thereby lowering income for everyone. Specifically, they allege that the addition of 2,500 new cars to the road at this juncture will further dilute driver earnings, by increasing competition for a finite number of available trips. Respondents maintain that this alleged harm is too speculative and hypothetical to constitute the type of concrete injury necessary to confer standing on the petitioners. Petitioners maintain that the alleged harm is not hypothetical and in fact has already occurred. However, a claim based on the number of drivers added to the road by virtue of the pilot program is clearly speculative at this juncture. Furthermore, a competitive injury, in and of itself, does not confer standing to challenge an administrative determination. While the number of SHL Pilot participants is capped at 2,500, the increase in the number of vehicles for hire could be far less. According to TLC, approximately 106,551 vehicles for hire were licensed in New York City when the pilot Program was enacted. At most, the SHL program will bring the number of licensed vehicles to 109,051, an increase of 2.34% While this increase may not be entirely negligible, it is far from a given that it would impact the market in any meaningful way. Additionally, since many SHL permits have been previously surrendered to the TLC, it is more likely that the increase in drivers caused by participation in the pilot program will be minimal, particularly given their limited ability to operate in Manhattan. Furthermore, none of the individual petitioners allege that they submitted an application for inclusion in the SHL Pilot Program or express any interest in participating in the program. Thus the claimed harm is even more speculative or hypothetical" (NY Taxi Workers Alliance v NY City Taxi & Limousine Commn., 2024 NY Misc LEXIS 56115, *4-5 [Sup Ct, NY County Mar. 29, 2024, index No. 154424/2023] [internal quotation marks, citations, and brackets omitted]).
IV.
In advocating for reversal of Supreme Court's order and remand for further proceedings, petitioners argue that they meet the two-part test necessary to demonstrate standing: that they have an injury in fact and that the harm they alleged falls within the zone of interests or concerns promoted or protected by Local Law 147.
As to the first showing, petitioners insist that the pilot program will result in additional, unnecessary FHVs on City streets, which will exacerbate the existing oversaturation of FHVs, cause deleterious competition for a finite pool of trips, and lead to a dilution in driver income and well-being. Petitioners assert that the future harm of lost income and its sequelae is sufficient to confer standing (i.e., they need not wait until the harm is realized before challenging the pilot program), and that the future harm of lost income is neither speculative nor conjectural based on statistics relating to the number of FHVs and the trips they accommodate, and the legislative findings underpinning Local Law 147.
As to the zone-of-interest showing, petitioners contend that two of the primary interests or concerns promoted by Local Law 147 are driver income and well-being, the very interests that petitioners claim will be harmed by the pilot program. Even assuming they are alleging a "competitive injury," which, by itself, would not satisfy the zone-of-interests showing, petitioners argue that Local Law 147 reflects an overriding legislative purpose to prevent destructive competition, which does satisfy the showing.
Respondents urge us to affirm Supreme Court's order for two reasons. First, they argue that petitioners have not alleged and cannot allege any concrete harm resulting from the pilot program. Respondents maintain that petitioners' claim of future harm is speculative and conjectural because it is based on the assumption that all 2,500 licenses will be issued when, as of the filing of respondents' brief, there were only 555 participants. Moreover, even assuming that all 2,500 licenses were to be issued, the pool of available FHVs would increase, at most, by only 3.4%, and petitioners offer no nonspeculative basis for tying such a small percentage increase in the availability of vehicles to a reduction in their income. Respondents note that the vehicles in the pilot program will have competitive effect in a limited market: prearranged services outside of the Manhattan central business district. Vehicles in the pilot program will not be competing with vehicles that can accept street hails, and they will not be competing with vehicles that can pick up passengers in the Manhattan central business district. Rather, the pilot program vehicles will operate in underserved areas where demand for service exceeds the supply. Ultimately, respondents maintain that the temporary, modest increase in SHLs occasioned by the pilot program would not cause petitioners any concrete harm.
Second, respondents stress that petitioners' alleged harm sounds in competitive injury and that such a form of injury does not support standing. Respondents insist that the exception to the rule against standing based on competitive injury does not apply because Local Law 147 promotes many interests, of which driver income and well-being are only two.
V.
A.
"Standing is a threshold determination, resting in part on policy considerations, that a person should be allowed access to the courts to adjudicate the merits of a particular dispute that satisfies the other justiciability criteria" (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769 [1991]; see Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d 1, 6 [2014]; New York State Assn. of Nurse Anesthetists v Novello, 2 NY3d 207, 211 [2004]; Matter of Dairylea Coop., Inc. v Walkley, 38 NY2d 6, 9 [1975]). The standing inquiry is "designed to ensure that the party seeking relief has a sufficiently cognizable stake in the outcome [of the proceeding] so as to cast the dispute in a form traditionally capable of judicial resolution" (Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148, 154-155 [1994] [internal quotation marks and brackets omitted]; see Matter of Mental Hygiene Legal Serv. v Daniels, 33 NY3d 44, 50 [2019]; Matter of Association for a Better Long Is., Inc., 23 NY3d at 6; Society of Plastics Indus., 77 NY2d at 772-773). Standing requirements therefore "'separate the tangible from the abstract or speculative injury, and the genuinely aggrieved from the judicial dilettante or amorphous claimant'" (Matter of Stevens v New York State Div. of Criminal Justice Servs., 40 NY3d 505, 516 [2023], quoting Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 812 [2003], cert denied 540 US 1017 [2003]; see Matter of Mental Hygiene Legal Serv., 33 NY3d at 50).
A CPLR article 78 petitioner challenging governmental agency action has the burden of establishing that it has standing to challenge that action; it satisfies that burden by establishing that it suffered an "injury in fact," and that the alleged injury falls within the zone of interests or concerns promoted or protected by a statute or other law (Matter of Stevens, 40 NY3d at 515; see Matter of Mental Hygiene Legal Serv., 33 NY3d at 50; Matter of Association for a Better Long Is., Inc., 23 NY3d at 6; New York State Association of Nurse Anesthetists, 2 NY3d at 211; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals of Town of N. Hempstead, 69 NY2d 406, 412 [1987]; Dairylea Coop., Inc., 38 NY2d at 9; see also David D. Siegel & Patrick M. Connors, New York Practice § 136 [6th ed 2018]).
"The injury-in-fact requirement necessitates a showing that the party has an actual legal stake in the matter being adjudicated and has suffered a cognizable harm that is not tenuous, ephemeral, or conjectural but is sufficiently concrete and particularized to warrant judicial intervention" (Matter of Stevens, 40 NY3d at 515 [internal quotation marks omitted]; see Matter of Mental Hygiene Legal Serv., 33 NY3d at 50; New York State Assn. of Nurse Anesthetists, 2 NY3d at 211; Society of Plastics Indus., 77 NY2d at 772-773). Where the party challenging a governmental action has sustained an injury in fact, that party has a concrete interest in prosecuting its action, providing a bona fide controversy for the court's consideration that will produce a confined, restrained judgment, as opposed to an advisory opinion (see Society of Plastics Indus., 77 NY2d at 773; see also Matter of Association for a Better Long Is., Inc., 23 NY3d at 6).
The zone of interest requirement circumscribes the universe of persons who can challenge an administrative action, demanding a connection between the petitioner's injury in fact and the challenged governmental act (see Society of Plastics Indus., 77 NY2d at 773). "[T]he requirement that a petitioner's injury fall within the concerns the Legislature sought to advance or protect by the statute assures that groups whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes" (id. at 774).
B.
Here, petitioners established both an injury in fact and that their alleged harm satisfies the zone of interest requirement, and they therefore have standing.
Regarding the injury in fact, petitioners allege a concrete, particularized harm: a loss of income and a deterioration of driver well-being occasioned by the introduction or potential introduction of additional vehicles into the for-hire market. That harm is neither speculative nor conjunctural; rather, it is well-demonstrated by the legislative facts underpinning Local Law 147, which facts are based, in part, on industry data. Moreover, petitioners' alleged harm is supported by the findings of the Committee on For-Hire Vehicles as expressed in their reports. The legislative materials evince a clear connection between the number of FHVs on the streets and driver income: when the number of FHVs increases without a corresponding increase in passenger demand, driver income decreases. Based on the circumstances, the risk that petitioners will suffer a loss of income if the pilot program proceeds "is not founded on impermissible layers of speculation" (Matter of Stevens, 40 NY3d at 515 [internal quotation marks omitted]; cf. Roulan v County of Onondaga, 21 NY3d 902, 905 [2013] [speculative financial loss is insufficient to demonstrate an injury in fact]). Whether the potential harm to individual drivers appears modest is not relevant to the standing inquiry; what is relevant is that petitioners have alleged that they will suffer a cognizable, economic harm that is not tenuous, ephemeral, or conjectural but is sufficiently concrete and particularized to warrant judicial intervention.[FN3]
That petitioners rest their claim of standing on future (as opposed to past or present) harm does not warrant dismissal of this proceeding. Because petitioners are, or represent the interests of, drivers who are licensed by the TLC and operate vehicles in the City, they have a unique and genuine risk of losing income as a result of the increased competition that may occur as a result of the pilot program (see Matter of Stevens, 40 NY3d at 515). So long as the pilot program is ongoing, petitioners remain at genuine risk that pilot SHLs will become operational, add to an oversaturated market, and cause petitioners to lose income.
Moreover, petitioners demonstrated that the alleged harms of loss of income and deterioration of driver well-being fall within the zone of interests or concerns promoted or protected by Local Law 147. Two of the principal interests or concerns expressly promoted or protected by the law are driver income and driver well-being (see Administrative Code § 19-550[a]; 35 RCNY 59A-06[a][1]), and the significant legislative history of Local Law 147 confirms that the City Council was concerned with the human costs associated with the exceptional growth in the FHV market, particularly drivers' ability to earn a living.
Relying on Dairylea Coop. (38 NY2d 6), respondents contend that petitioners' harm sounds in competitive injury; that such an injury will not confer standing unless the relevant statute reflects an overriding purpose to prevent destructive competition; and that the law relied upon by petitioners, Local Law 147, while reflecting the City Council's concern for driver income and well-being, does not reflect an overriding purpose to prevent destructive competition.[FN4] While we agree with respondents that petitioners' alleged harm sounds in competitive injury, we conclude that Dairylea Coop., strongly supports petitioners' claim of standing.
In Dairylea Coop., the petitioner was a licensed milk dealer authorized to sell milk in certain New York counties (id. at 8-9). Another milk dealer applied to the New York State Commissioner of Agriculture and Markets for an extension of its license to sell milk within the petitioner's territory (id. at 9). The Commissioner granted the request for the extension, prompting the petitioner to bring a CPLR article 78 proceeding challenging the Commissioner's determination (id.). The motion court concluded that the petitioner lacked standing because it was not within the zone of interests protected by the relevant statute, Agriculture and Markets Law § 258-c (Matter of Dairylea Coop., Inc. v Walkley, 79 Misc 2d 707 [Sup Ct, Albany County 1974], affd 48 AD2d 951 [3d Dept 1975], revd 38 NY2d 6 [1975]).
A divided panel of the Third Department affirmed, with the majority relying on the opinion of the motion court (see Dairylea Coop., 48 AD2d at 951). The dissent commented that the petitioner's alleged economic injury occasioned by the introduction of a competitor into its territory was sufficient to satisfy the injury in fact requirement (id. at 951-952 [Sweeney, J., dissenting]). As to the zone of interests issue, the dissent looked at Matter of Friendship Dairies v Du Mond (284 AD 147 [3d Dept 1954]), which analyzed the then-applicable version of Agriculture and Markets § 258-c, and found the following passage "most illuminating":
"In its brief in this court, the petitioner broadened its attack and took the position that the statute was not designed to regulate competition among dealers in the purchase of milk but was intended only to prevent unfair and destructive practices in their selling activities. We do not find any basis in the legislative history or in the language of the statute for this construction. It is plain on the face of the statute that the purpose of the Legislature was an all-embracing one and that it was the intention of the Legislature to stabilize the entire distribution structure of the milk industry (Agriculture and Markets Law § 258-k). The elaborate provisions of the statute for the licensing of dealers in selling their product are designed not only to prevent destructive competition among dealers in selling their product but also to prevent destructive competition in their buying of milk from milk producers. Destructive competition is equally injurious to the stability and solvency of dealers, whether it occurs in the buying or in the selling end of the business" (Matter of Dairylea Coop., Inc., 48 AD2d at 952 [Sweeney, J., dissenting, quoting Matter of Friendship Dairies, 284 AD at 153]).
The dissent closed with this critical observation: "[s]ince petitioner alleges injury — a threatened destruction of competition — and the statute in question was enacted to prohibit, among other things, destructive competition in the milk industry, petitioner comes within the orbit of the [zone of interests requirement] and is entitled to review the Commissioner's determination" (id. [emphasis added]).[FN5]
The Court of Appeals reversed the order of the Appellate Division, which affirmed the motion court's finding of a lack of standing (Dairylea Coop., 38 NY2d 6). After a brief review of the standing requirement, and acknowledging the two-part test for establishing standing, the Court recognized that the petitioner had alleged an injury in fact, i.e., potential economic harm by a prospective competitor (id. at 9). The Court went on to discuss "the applicability and scope of the Agriculture and Markets Law," considering whether the petitioner's alleged economic harm was within the zone of interests that the then-operative version of Agriculture and Markets Law § 258-c protected (id. at 9-11). Siding with the petitioner and concluding that it satisfied the zone of interests requirement, the Court stated that "[t]he determinative factor is the specific incorporation into the statute of the objective of preventing destructive competition" (id. at 11). The Court went on to state, "[o]f course, competitive injury, of itself, will not confer standing," and it discussed the Third Department's decision in Bank v Allen (35 AD2d 245 [1970]), writing, "[i]n the Allen case a committee representing pharmacy owners and operators was denied standing to oppose administrative action because the relevant statute did not require that economic competition be considered by the board in approving such an application" (Dairylea Coop., 38 NY2d at 11, citing Bank, 35 AD2d 245). The Court found, though, that "where a statute reflects an overriding legislative purpose to prevent destructive competition, an injured competitor has standing to require compliance with that statute" (Dairylea Coop. at 11).
Respondents give great weight to the Court's use of the phrase "overriding legislative purpose," and insist that because Local Law 147 does not focus solely on the prevention of destructive competition but rather is concerned with several issues in addition to destructive competition (i.e., access to FHV service throughout the City, traffic congestion, and accessibility of vehicles for disabled passengers),[FN6] petitioners do not have standing. Reading the Court of Appeals' Dairylea Coop. decision as a whole and placing the "overriding legislative purpose" principle in context — particularly the context of the statute the Court was considering — we cannot agree with respondents that the sole purpose of a statute must be the prevention of destructive competition. Rather, we conclude that the controlling inquiry in this connection ("the determinative factor" in the words of the Dairylea Coop. Court) "is the specific incorporation into the statute of the objective of preventing destructive competition" (id.; see Matter of Barnes v Binghamton Urban Renewal Agency, 115 AD2d 803, 804 [3d Dept 1985]). Given that driver income is an expressly enumerated factor in Administrative Code § 19-550(a) (see Administrative Code § 19-550[a][i], [viii]) and that concern is plainly tied to the City Council's objective to prevent destructive competition, petitioners satisfy the zone of interests requirement.[FN7] "To deny petitioner[s] standing would invite the subversion of
the legislative goal of maintaining a healthy competitive atmosphere in the [vehicle for hire] industry" (Dairylea Coop.,38 NY2d at 11-12).
VI.
Petitioners have established that they meet the two-prong test for standing; therefore, the petition should not have been dismissed. Because Supreme Court decided the petition solely based on standing and did not otherwise reach the merits of the petition, we remand the matter to Supreme Court for further proceedings.
Accordingly, the judgment (denominated an order) of the Supreme Court, New York County (Nicholas W. Moyne, J.), entered on or about March 29, 2024, denying the petition to, among other things, vacate and annul, and enjoin respondents' implementation of, the Street Hail Livery pilot program, and implicitly dismissing the proceeding brought pursuant to CPLR article 78 due to lack of standing, should be reversed, on the law, without costs, the petition reinstated, and the matter remanded to Supreme Court for further proceedings.
Judgment (denominated an order), Supreme Court, New York County (Nicholas W. Moyne, J.), entered on or about March 29, 2024, reversed, on the law, without costs, the petition reinstated, and the matter remanded to Supreme Court for further proceedings.
Opinion by Higgitt, J. All concur.
Webber, J.P., Kapnick, Gesmer, Higgitt, Hagler, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: November 25, 2025

Footnotes

Footnote 1: Manhattan's central business district refers to that part of the island that is south of East 96th Street and West 110th Street (id. at 296 n 1).

Footnote 2: According to the petition, "[petitioner] NYTWA members face immediate further dilution of their ability to receive work with the pending licensure of 2,500 new, unnecessary vehicles, increasing the available pool of vehicles by 3.5%. Because drivers bear their own vehicle expenses a 3.5% reduction in gross pay can amount to a roughly 6.2% reduction in net pay." The petition offered the following example: "a driver who may annually earn $70,000 in fare revenue, may incur $30,000 in annual expenses (vehicle payments, commercial insurance, fuel, licensing costs, maintenance). Thus the difference between gross pay of $70,000, reduced by 3.5% ($67,550), means a diminution in take home pay from 40,000 to 37,550, or a 6.175% decrease in take home pay."

Footnote 3: While the potential loss of a few thousand dollars in net income (see footnote 2, supra) may seem modest to some, that loss can be significant, financially catastrophic even, to many working-class New Yorkers.

Footnote 4: Although respondents suggest that the principle that competitive injury, by itself, is insufficient to confer standing relates to the injury in fact requirement, Dairylea Coop. makes plain that the competitive injury issue relates to the zone of interests requirement (Dairylea Coop., 38 NY2d at 9 ["In the case before us, there is no issue as to the deleterious effect on Dairylea of the commissioner's action [i.e., injury in fact requirement]; rather the dispute concerns the applicability and scope of the Agriculture and Markets Law [i.e., the zone of interests requirement"]; see Matter of Sun-Brite Car Wash, 69 NY2d at 415). As the Third Department stated, "[w]hile a competitive injury may in some instances be sufficient to confer standing, the critical showing is that such an injury falls within the zone of interest of the controlling statute" (Matter of Troy Ambulance Serv. v New York State Dept. of Health, 260 AD2d 715, 716 [3d Dept 1999], citing Dairylea Coop., 38 NY2d at 9; see also Matter of Dorsett-Felicelli, Inc. v County of Clinton, 18 AD3d 1064, 1065 [3d Dept 2005], lv denied 5 NY3d 716 [2005]; Matter of C.L.B. Check Cashing, Inc. v McCaul, 5 AD3d 593, 593 [2d Dept 2004]; Matter of LaSalle Ambulance, Inc. v New York State Dept. of Health, 245 AD2d 724, 725 [3d Dept 1997], lv denied 91 NY2d 810 [1998]; Matter of Blue Cross of W. N.Y. v Cooper, 164 AD2d 578, 581 [3d Dept 1991]; New York Hearing Aid Socy. v Children's Hosp. & Rehabilitation Ctr. of Utica, 91 AD2d 333, 334 [2d Dept 1983], lv dismissed 59 NY2d 607 [1983]; Matter of Oil Heat Inst. of Long Is. v Public Serv. Commn. of State of N.Y., 72 AD2d 828, 829 [3d Dept 1979], lv denied 49 NY2d 707 [1980]; cf. Hunts Point Term. Produce Coop. Assn., Inc. v New York City Economic Dev. Corp., 36 AD3d 234, 247 [1st Dept 2006] ["Standing for the (petitioner) premised on an alleged absence of competitive bidding does not bring the (petitioner) within a relevant 'zone of interest' for standing because the process at issue is wholly exempt from competitive bidding by law"], lv denied 8 NY3d 827 [2007]).

Footnote 5: The version of Agriculture and Markets Law § 258-c that was applicable at the time of the Dairylea Coop. litigation required the Commissioner to deny a milk dealer license if the applicant was not qualified to conduct its proposed business, if the issuance of the license would tend to cause destructive competition in a market that was already adequately served, or if the issuance of the license was not in the public interest (compare L 1939, ch 126 with L 1987, ch 540).

Footnote 6: This is not a situation where the statute or local law does not list economic competition as a factor that must be taken into account by the administrative agency (see Matter of Troy Ambulance Serv., Inc., 260 AD2d 715; Matter of Dorsett-Felicelli, Inc., 18 AD3d 1064; Matter of LaSalle Ambulance, Inc., 245 AD2d 724; Matter of Blue Cross of W. N.Y., 164 AD2d 578; New York Hearing Aid Socy., 91 AD2d 333; Matter of Oil Heat Inst. of Long Is., 72 AD2d 828; Matter of Bank v Allen, 35 AD2d 245).

Footnote 7:Indeed, "the very interest petitioner[s] allege[] is being threatened is one of the interests which [Local Law 147] was designed to protect" (Dairylea Coop., 48 AD2d at 952 [Sweeney, J., dissenting] [emphasis added]).